# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

## THE ATLANTIC GROUP, INCORPORATED

### Petitioner/Cross-Respondent

### v.

## NATIONAL LABOR RELATIONS BOARD

### Respondent/Cross-Petitioner

———————————————

## ON PETITION FOR REVIEW AND CROSS-APPLICATION
## FOR ENFORCEMENT OF AN ORDER OF
## THE NATIONAL LABOR RELATIONS BOARD

———————————————

## BRIEF FOR THE NATIONAL LABOR RELATIONS BOARD

———————————————

**MILAKSHMI V. RAJAPAKSE**
*Supervisory Attorney*

**DAVID SEID**
*Attorney*

***National Labor Relations Board***
**1015 Half Street, SE**
**Washington, DC 20570**
**(202) 273-4231**
**(202) 273-2941**

**JENNIFER A. ABRUZZO**
*General Counsel*
**PETER SUNG OHR**
*Deputy General Counsel*
**RUTH E. BURDICK**
*Deputy Associate General Counsel*
**DAVID HABENSTREIT**
*Assistant General Counsel*

## STATEMENT REGARDING ORAL ARGUMENT

The Board submits that oral argument would not be helpful to the Court. This case involves the Board's application of well-established standards to straightforward, largely undisputed facts, and the Company raises no novel or complex issues. However, if the Court believes that oral argument would be of assistance or if it grants the Company's request for oral argument, the Board respectfully requests the opportunity to participate.

# TABLE OF CONTENTS

**Headings**                                                                                    **Page(s)**

Statement of jurisdiction ............................................................................1

Statement of the issues presented ..............................................................2

Statement of the case ...............................................................................3

  I. The Board's findings of fact............................................................3

    A. The Company's operations; employees seek union
       representation.................................................................................3

    B. The Company threatens employees with job loss if they vote for
       union representation  ................................................................5

    C. Employees vote for union representation; the Company refuses to
       recognize or bargain with the Union and refuses to give the Union
       requested information pertaining to the bargaining-unit employees........7

    D. The Company lays off two employees without providing the Union
       with notice or an opportunity to bargain .................................................8

    E. Four months after the Union's certification, the Company agrees to
       recognize and bargain with the Union and thereafter supplies some,
       but not all, of the information the Union had requested months earlier ...8

  II. The Board's conclusions and order ............................................................10

Standard of review ........................................................................11

Summary of argument ........................................................................12

# TABLE OF CONTENTS (cont'd)

**Headings**                                                             **Page(s)**

I. The Board is entitled to summary enforcement of the portions of its Order corresponding to the uncontested finding that the Company violated the Act by failing to furnish and/or timely furnish the Union with requested information ................................................................................................14

II. Substantial evidence supports the Board's finding that the Company violated Section(a)(1) of the Act by threatening employees with job loss if they voted for union representation.................15

    A. The Act prohibits an employer from engaging in conduct that has reasonable tendency to coerce employees in the exercise of their statutory rights to organize and support a union.....................15

    B. Employees would reasonably construe company superintendent Bales' statements as a threat of job loss if they selected the Union as their collective-bargaining representative ...........................16

    C. The Company's Contentions are without merit ..................................18

        1. The Board's finding is not based on "suspicion and conjecture" ...........................................................18

        2. The Company's statements are not protected under Section 8(c) of the Act.................................................................................20

            a. Section 8(c) does not protect threats directed at employees' statutorily protected activity, and to avoid unlawful coercion of employees, even predictions about the negative economic effects of unionization must be based on objective fact .........................................................................20

            b. The Company has not established that its threats of job loss were mere predictions based on objective fact.................21

# TABLE OF CONTENTS (cont'd)

**Headings**                                                       **Page(s)**

III. Substantial evidence supports the Board's finding that the Company violated Section(a)(5) and (1) of the Act by refusing to recognize and bargain with the Union as the employees' collective-bargaining representative, and by unilaterally laying off two unit employees .........26

    A. An employer has a statutory duty to bargain with its employees' chosen representative; it violates the Act by refusing to bargain, and by unilaterally changing employees' terms and conditions of employment ..................................................................26

    B. The Company unlawfully refused to recognize and bargain with the Union ..................................................................29

    C. The Company unlawfully laid off two bargaining-unit employees ....31

        1. The Company failed to establish a past practice of laying off employees in response to project delays .................................33

            a. To make out a past practice, the employer must show a regular and frequent pattern of past actions that are similar in kind and degree to the disputed action.................................33

            b. The Company's prior layoffs do not establish a past practice ..................................................................35

            c. Employment agreements and the Company's handbook do not establish a past practice.................................42

        2. The Company's remaining contentions are without merit.............44

Conclusion .................................................................................47

Certificate of Service .................................................................48

Certificate of Compliance ..........................................................49

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Adair Standish Corp. v. NLRB,*
  912 F.2d 854 (6th Cir. 1990) ........................................................ 32, 38

*Advertisers Mfg. Co. v. NLRB,*
  677 F.2d 544 (7th Cir. 1982) ............................................................... 28

*Allentown Mack Sales & Serv., Inc. v. NLRB,*
  522 U.S. 359 (1998) ........................................................................... 11

*Allied Chem. & Alkali Workers of America v. Pittsburgh Plate Glass Co.,*
  404 U.S. 157 (1971) ........................................................................... 26

*Armstrong Cork Co. v. NLRB,*
  211 F.2d 843 (5th Cir. 1954) .............................................................. 27

*Aspirus Keweenaw,*
  370 NLRB No. 45 (2020) .................................................................... 38

*Audio Visual Servs. Grp., Inc.,*
  365 NLRB No. 84 (2017) .................................................................... 28

*Bemis Co.,*
  370 NLRB No. 7 (2020) ........................................... 29, 32, 34, 39, 41

*Benchmark Indus., Inc.,*
  262 NLRB 247 (1982), *enforced mem.,*
  724 F.2d 974 (5th Cir. 1984) .............................................................. 28

*Boire v. Greyhound Corp.,*
  376 U.S. 473 (1964) ........................................................................... 30

*Brown and Root, Inc. v. NLRB*
  333 F.3d 628 (5th Cir. 2003) ........................................................ 19, 22

*Care One at Madison Ave., LLC,*
  832 F.3d 351 (D.C. Cir. 2016) ........................................................... 17

iv

# TABLE OF AUTHORITIES

**Cases**                                                        **Page(s)**

*Care One at New Milford*,
    369 NLRB No. 109 (2020) ............................................................... 44

*Champion Home Builders, Co.*,
    350 NLRB 788 (2007) ................................................................ 39

*City Cab Co. of Orlando, Inc. v. NLRB*,
    787 F2d 1475 (11th Cir. 1986) ....................................................... 34

*Contemporary Cars, Inc. v. NLRB*,
    814 F.3d 859 (7th Cir. 2016) ......................................................... 31

*CPL (Linwood), LLC*,
    367 NLRB No. 14 (2018) ............................................................. 35

*Curwood, Inc.*,
    339 NLRB 1137 (2003) ............................................................... 25

*Daily News of Los Angeles*,
    315 NLRB 1236 (1994), *enforced*,
    73 F.3d 406 (D.C. Cir. 1996) ......................................................... 33

*DTR Indus., Inc. v. NLRB*,
    39 F.3d 106 (6th Cir. 1994) ...................................................... 24, 25

*El Paso Elec. Co. v. NLRB*
    681 F.3d 651 (5th Cir. 2012) .................................................... 12, 15

*Eugene Iovine, Inc.*,
    328 NLRB 294 (1999), *enforced mem.*,
    1 F. App'x 8 (2d Cir. 2001), ......................................................... 35

*Exxon Shipping Co.*,
    291 NLRB 489 (1988) ................................................................ 33

# TABLE OF AUTHORITIES

**Cases**                                                               **Page(s)**

*Flex Frac Logistics, LLC v. NLRB*,
746 F.3d 205 (5th Cir. 2014) ....................................................... 11, 33

*Gannett Rochester Newspapers*,
319 NLRB 215 (1995) ....................................................................... 44

*Hogan Transports*,
363 NLRB 1980, 1982 (2016)........................................ 23, 24, 25, 26

*Howmet Corp.*,
197 NLRB 471 (1972) ....................................................................... 27

*ITT Automotive v. NLRB*,
188 F.3d 375 (6th Cir. 1999) ........................................................... 24

*J. Vallery Elec., Inc. v. NLRB*,
337 F.3d 446 (5th Cir. 2003) ........................................................... 11

*King Radio Corp. v. NLRB*,
398 F.2d 14 (10th Cir. 1968) ........................................................... 30

*Laney & Duke Storage Warehouse Co.*,
151 NLRB 248 (1965) ....................................................................... 27

*Local 512, Warehouse & Off. Workers' Union v. NLRB*,
795 F.2d 705 (9th Cir. 1986) ..................................................... 32, 39

*L. Suzio Concrete Co.*,
325 NLRB 392, 396 (1998), *enforced mem.*,
173 F.3d 844 (2d Cir. 1999) ............................................................ 28

*Madison Detective Bureau, Inc.*,
250 NLRB 398 (1980) .......................................................................28

*May Dept. Stores Co. v. NLRB*,
326 U.S. 376 (1945) .......................................................................... 27

# TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*Mike O'Connor Chevrolet,*
209 NLRB 701 (1974), *enforcement denied on other grounds,*
512 F.2d 684 (8th Cir. 1975) ........................................................ 28, 31

*Mike-Sell's Potato Chip Co.,*
360 NLRB 131 (2014), *enforced,*
807 F.3d 318 (2015) ........................................................................ 35

*Mike-Sell's Potato Chip Co.,*
368 NLRB No. 145 (2019).................................................... 34, 40, 41

*NLRB v. Advertisers Mfg., Co.,*
823 F.2d 1086 (7th Cir. 1987) ......................................................... 31

*NLRB v. Acme Indus. Co.,*
385 U.S. 432 (1967) ........................................................................ 14

*NLRB v. Allis-Chalmers Corp.,*
601 F.2d 870 (5th Cir. 1979) ............................................... 28, 30, 34

*NLRB v. Brookwood Furniture, Div. of U.S. Indus.,*
701 F.2d 452 (5th Cir. 1983) ........................................................... 16

*NLRB v. Brownwood Mfg. Co.,*
363 F.3d 136 (5th Cir. 1996) ........................................................... 25

*NLRB v. CJC Holdings, Inc.,*
97 F.3d 114 (5th Cir. 1996) ............................................................. 15

*NLRB v. Downtown BID Servs. Corp.,*
682 F.3d 109 (D.C. Cir. 2012) ........................................................ 29

*NLRB v. Gissel Packing Co.,*
395 U.S. 575 (1969) .................................... 16, 17, 21, 22, 23, 24, 25

vii

# TABLE OF AUTHORITIES

**Cases**                                                                                                                    **Page(s)**

*NLRB v. Kaiser Agric. Chems.,*
    473 F.2d 374 (5th Cir. 1973) ............................................................................ 21

*NLRB v. Katz,*
    369 U.S. 736 (1962) ........................................................................... 27, 28, 33

*NLRB v. Laney & Duke Storage Warehouse Co.,*
    369 F.2d 859 (5th Cir. 1966) ..................................................................... 27, 28

*NLRB v. Link-Belt Co.,*
    311 U.S. 584 (1941) ...................................................................................... 11

*NLRB v. McCullough Envtl. Servs.,*
    5 F.3d 923 (5th Cir. 1993) ........................................................................... 16

*NLRB v. Pentre, Elec., Inc.,*
    998 F.2d 363 (6th Cir. 1993) ........................................................................ 23

*NLRB v. S.R.D.C., Inc.,*
    45 F.3d 328 (9th Cir. 1995) ..........................................................................29

*NLRB v. Sandpaper Convalescent Ctr.,*
    824 F.2d 318 (4th Cir. 1987) ........................................................................ 28

*NLRB v. Transportation Clearings, Inc.,*
    311 F.2d 519 (5th Cir. 1962) ........................................................................ 25

*NLRB v. W.R. Grace & Co.,*
    571 F.2d 279 (5th Cir. 1978) .......................................................... 27, 28, 31, 32

*NLRB v. Westinghouse Broadcasting & Cable, Inc.,*
    849 F.2d 15 (1st Cir. 1988) .......................................................................... 31

*NLRB v. Wooster Div.,*
    356 U.S. 342 (1958) ...................................................................................... 26

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*NP Palace LLC*,
   368 NLRB No. 148 (2019), *review denied*,
   1 F. 4th 12 (D.C. Cir. 2021) .............................................................. 30

*NP Texas LLC d/b/a Texas Station Gambling Hall & Hotel*,
   370 NLRB No. 11 (2020) ................................................................. 38

*Ozburn-Hessey Logistics, LLC v. NLRB*,
   939 F3d 777 (6th Cir. 2019) ............................................................ 31

*Palm Beach Metro Transp., LLC*,
   327 NLRB 180 (2011), *enforced mem.*,
   459 F. App'x 874 (11th Cir. 2012)................................................... 34

*Patsy Bee, Inc. v. NLRB*,
   654 F.2d 515 (8th Cir. 1981) ........................................................... 25

*PG Publishing Co.*,
   368 NLRB No. 41 (2019)................................................................. 35

*Pinkerton, Inc.*,
   309 NLRB 723 (1992) ..................................................................... 25

*Quality Health Servs. of P.R., Inc. v. NLRB*,
   873 F.3d 375 (1st Cir. 2017) ............................................................34

*Raytheon Network Centric Sys.*,
   365 NLRB No. 161 (2017)..................................................... 34, 40, 41

*Remington Lodging & Hospitality, LLC. v. NLRB*,
   847 F.3d 180 (5th Cir. 2017) ........................................................... 15

*Rose Fence, Inc.*,
   359 NLRB 225 (2012) ), *reaffirmed*,
   361 NLRB 1198 (2014)............................................................. 29, 32

**Cases**                                                                                          **Page(s)**

*Schaumburg Hyundai, Inc.*,
    318 NLRB 449 (1995) ..................................................................... 23

*Selikirk Metalbestos, North America, Eljer Mfg. v. NLRB*,
    116 F.3d 782 (5th Cir. 1997) ...................................................... 19, 20

*Strand Theatre of Shreveport Corp. v. NLRB*,
    493 F.3d 515 (5th Cir. 2007) ........................................................... 11

*T-Mobile USA, Inc. v. NLRB*,
    865 F.3d 265 (5th Cir. 2017) ........................................................... 15

*Technicolor Gov't Servs., Inc. v. NLRB*,
    739 F.2d 323 (8th Cir. 1984) ........................................................... 30

*Tellepsen Pipeline Servs. Co. v. NLRB*,
    320 F.3d 554 (5th Cir. 2003) ........................................... 16, 17, 21, 23

*Terrace Gardens Plaza, Inc. v. NLRB*,
    91 F.3d 222 (D.C. Cir. 1996) ........................................................... 30

*Texas Industries, Inc. v. NLRB*,
    336 F.2d 128 (5th Cir. 1964) ........................................................... 25

*TNT Logistics North America, Inc.*,
    345 NLRB (2005) ........................................................................... 25

*Tri-Tech Servs., Inc.*
    340 NLRB 894 (2003).................................................................. 39, 42

*TRW-United Greenfield Div. v. NLRB*,
    637 F.2d 410 (5th Cir. 1981) ...................................................... 16, 21

*United Supermarkets, Inc. v. NLRB*,
    862 F.2d 549 (5th Cir. 1989) ........................................................... 11

# TABLE OF AUTHORITIES

**Cases**      **Page(s)**

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474 (1951) ................................................................ 11

*UXB Int'l*,
  321 NLRB 446 (1996) ......................................................... 24, 25

*Volkswagen Grp. of America, Inc.*,
  364 NLRB No. 110 (2016) ....................................................... 28

**Statutes**      **Page(s)**

National Labor Relations Act, as amended
  (29 U.S.C. § 151 et seq.)

Section 3 (29 U.S.C. § 153) ....................................................... 35
Section 7 (29 U.S.C. § 157) ........................................... 10, 15, 17
Section 8(a)(1) (29 U.S.C. § 158(a)(1)) ..............10, 12-17, 20-21, 29, 32
Section 8(a)(5) (29 U.S.C. § 158(a)(5)) ............... 10, 12-16, 26-27, 29, 32, 35, 46
Section 8(c) (29 U.S.C. § 158(c)) .............................13, 20-22, 25
Section 8(d) (29 U.S.C. § 158(d)) ..................................... 26, 32
Section 10(a) (29 U.S.C. § 160(a)) .......................................... 2
Section 10(e) (29 U.S.C. § 160(e)) ................................. 2, 11, 30
Section 10(f) (29 U.S.C. § 160(f)) ................................... 2, 30

# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

### No. 22-60442

_____

## THE ATLANTIC GROUP, INCORPORATED

**Petitioner/Cross-Respondent**

v.

## NATIONAL LABOR RELATIONS BOARD

**Respondent/Cross-Petitioner**

_____

## ON PETITION FOR REVIEW AND CROSS-APPLICATION
## FOR ENFORCEMENT OF AN ORDER OF
## THE NATIONAL LABOR RELATIONS BOARD

_____

## BRIEF FOR
## THE NATIONAL LABOR RELATIONS BOARD

_____

## STATEMENT OF JURISDICTION

This case is before the Court on the petition of The Atlantic Group, Inc.

("the Company") to review, and the cross-application of the National Labor

Relations Board ("the Board") to enforce, a Board Order issued against the

Company on July 27, 2022, and reported at 371 NLRB No. 119.  (ROA.1082-99.)[1]

The Board had jurisdiction over the unfair-labor-practice proceeding below under

Section 10(a) of the National Labor Relations Act ("the Act"), as amended, 29

U.S.C. § 160(a), which empowers the Board to prevent unfair labor practices

affecting commerce.  The Board's Order is final with respect to all parties.  The

Court has jurisdiction over this appeal under Section 10(e) and (f) of the Act, 29

U.S.C. §160(e) and (f).  Venue is proper because the unfair labor practices

occurred in Texas.  Both the Company's petition for review and the Board's cross-

application were timely, as the Act imposes no time limits on such filings.

## STATEMENT OF THE ISSUES PRESENTED

1.  Whether the Board is entitled to summary enforcement of the portions of

its Order corresponding to the uncontested finding that the Company violated

Section 8(a)(5) and (1) of the Act by failing to furnish and/or unreasonably

delaying in furnishing the Union with requested, relevant, and necessary

information.

2.  Whether substantial evidence supports the Board's finding that the

Company violated Section 8(a)(1) of the Act by threatening employees with job

loss if they voted for union representation.

---

[1] "ROA." refers to the record on appeal filed by the Board.  References preceding a
semicolon are to the Board's findings; those following are to the supporting
evidence.

3. Whether substantial evidence supports the Board's finding that, following the employees' selection of the Union as their exclusive collective-bargaining representative, the Company violated Section 8(a)(5) and (1) of the Act by failing and refusing to recognize and bargain with the Union, and by laying off two bargaining-unit employees without giving the Union prior notice and an opportunity to bargain.

## STATEMENT OF THE CASE

## I. THE BOARD'S FINDINGS OF FACT

### A. The Company's Operations; Employees Seek Union Representation

The Company, a subsidiary of Day & Zimmermann, provides maintenance and modification services to several dozen nuclear and fossil-fuel powerplants. (ROA.1089-90;ROA.130, 177, 221, 305, 340.)  On January 30, 2020, the Company began a five-year contract to perform maintenance work at the Comanche Peak Nuclear Power Plant in Glen Rose, Texas, and hired almost all of the former contractor's employees.  The plant, owned and operated by Luminant Generation Company, contains two nuclear reactors.  (ROA.1090;ROA.104-06, 124, 306-07, 438-39.)  While the plant is on-line, i.e., generating electricity, the Company's "core" employees provide a wide range of services including mopping floors, cutting grass, building scaffolds, painting, and repairing air conditioning units.  (ROA.1090;ROA.104, 306-07.)  While the Plant is offline for maintenance,

i.e. not generating electricity, a separate group of temporary or traveling company employees work on distinct tasks specific to plant-shutdown periods. (ROA.1090;ROA.105-06, 307-10.)

In early February, after the Company began operations at the plant, its employees started a campaign to be represented by the International Brotherhood of Electrical Workers, Local Union 220 ("the Union"). (ROA.1091;ROA.45-46, 67.) Later that month, the Union filed a petition with the Board's Regional Office to represent the Company's core employees, specifically describing the bargaining unit as excluding outage employees. (ROA.1091;ROA.417.) The Company objected to the exclusion of the outage employees. On March 18, after a hearing on the Company's objection, the Board's Regional Director issued a Decision and Direction of Election finding that the petitioned-for bargaining unit was appropriate and ordering a mail ballot election among the employees in that unit.[2]

---

[2] The unit included: All full-time and regular part-time employees in Radiation Protection (RP) and Maintenance and Modification (M&M), including JR Decon, SR Decon, JR HP, SR HP, Carpenters, Carpenter Helpers, Millwright Helpers, Electricians (Journeyman), Electrical Helpers, Insulators (Journeyman), Insulator Helpers, Painters (Journeyman), Painter Helpers, Pipefitters (Journeyman), Pipefitter Helpers, Riggers, Welders (Journeyman), Equipment Operators, Mechanics (Journeyman), Heavy Equipment Operators, Heavy Equipment Mechanics, Foremen (Operator), Foremen (Paint), Foremen (Pipefitter), Laborers Utility, Laborers (Entry) Fire Watch, and Laborers (Proficient) Foremen employed by the Employer at Comanche Peak Nuclear Power Plant in Somervell County, Texas. (ROA.1086.)

(ROA.1091;ROA.46-47, 303-15.)  The vote was held by mail beginning on April 20, 2020, and concluded in a mail-ballot count on May 29.  (ROA.1091;ROA.48.)

**B.      The Company Threatens Employees with Job Loss if They Vote for Union Representation**

At some point between the issuance of the Decision and Direction of Election on March 18 and the mailing of ballots to employees on April 20, Jerry Bales, the site superintendent who oversaw all of the Company's operations at the plant, addressed a group of bargaining-unit employees at an on-site meeting. (ROA.1090;ROA.104, 177, 222, 321.)  Bales began by informing employees that he wanted to talk to them about the Union and noting that they have "had a chance to go through all of the sessions" and heard "a lot of stuff" from the Company's side.  (ROA. 319.)  Bales then told the employees that he thought "the world" of them and was "very proud" of them.  (ROA.319-20.)  After describing the last five years as "the most challenging in [his 30-year] career," Bales made a series of stark statements about the further negative turn matters would take if employees unionized.  (ROA.321.)  He specifically said:

> [B]ased on the experiences I have had since 1990, . . . the client [Luminant] wants this [maintenance] group to remain non-union. . . .  [T]here have been several opportunities . . . for them to bring this group in-house, but they haven't for a reason.  They want this group to be non-union.  That's my opinion.  I have heard it from Luminant executives in the past.

---

Excluded: All other employees, outage employees, Document Control Center employees, Mailroom employees, Planning employees, office clerical employees and guards, and supervisors as defined in the Act.  (ROA.1091;ROA.305.)

\* \* \*

[H]ow come they don't bring us in-house?  It would save them money.  Again, there is a reason; they don't want us to be union.

I protected everyone that's in this room[] jobs more than once and some people, several times . . . . I have done a lot of things behind the scenes that you all don't know about.  I hear all of the business meetings.  The business model for this group is not to be union.  And in my opinion, if this group, if this company . . . tries to go union, I do not believe anybody in this room will have a job in six months . . . . I don't believe that [the Company] will be here.  [The Company's] executives have already said that this part of [Day and Zimmermann] that we work for, they have no union jobs, and they will not continue this job if it goes union.  That is why I do not—it is my belief, that if we go union, that the client will pick another contractor to come in here and bring their own people, 'do not hire any of these people.'  That's my opinion.

\* \* \*

I can remember one thing that one of my teachers told me back in school.  We was all seniors getting ready to graduate, and that this is the last time we are going to see each other all at the same time.  That is my belief on this, that if this goes union, that this will be the last time this group is together like it is now.  Again, that is my opinion.

\* \* \*

But, you know, I don't know, again, how it would be if the union comes in here.  I can only . . . speculate, but from what I have seen and from what I know from a business standpoint, it is not going to be good.  But, again, that is just my opinion.

(ROA.1091;ROA.320-28.)

**C.** **Employees Vote for Union Representation; the Company Refuses To Recognize or Bargain With the Union and Refuses To Give the Union Requested Information Pertaining to the Bargaining-Unit Employees**

The representation election proceeded as scheduled, with ballots mailed to employees on April 20. On May 29, voting concluded and the tally of ballots showed that a majority of votes were cast in favor of union representation.[3] Accordingly, on June 8, the Board's Regional Director certified the Union as the exclusive collective-bargaining representative of the unit employees. (ROA.1091;ROA.178, 223, 438.) Nearly two weeks later, the Company filed with the Board a request for review of the certification on several grounds, including the exclusion of outage workers from the unit. (ROA.1091;ROA.50, 430-64.)

Thereafter, on June 22, the Union requested in writing that the Company recognize and bargain with it, and provide information needed for collective-bargaining purposes, including information about employees' wages and benefits, and the Company's policies. (ROA.1091-93;ROA.50, 178-79, 223-24, 290-97, 467.) A few days later, on June 25, the Union requested additional information,

---

[3] Some employees not specifically covered by the unit description were permitted to vote subject to later challenge. Among those in this category were several employees who oversaw fishing and boating activities at an on-site lake open to the public. (ROA.1083 and n.6.) None of these "lake employees" ultimately voted, and their status with respect to the bargaining unit was never resolved. (ROA.1083 and n.6).

regarding the Company's COVID-19 policies and employee exposure to COVID-19.  (ROA.1093;ROA.180, 224, 298-99.)  On June 30, the Company informed the Union that it would refuse to recognize, bargain with, or provide information to the Union on the ground that its challenge to the results of the representation election was pending before the Board.  (ROA.1093;ROA.50, 72-73, 469.)

### D. The Company Lays Off Two Employees Without Providing the Union with Notice or an Opportunity To Bargain

In July, bargaining-unit electricians David Smith and Jose Mendez, who had worked for the Company since it began operations at the plant earlier in the year, were assigned to a project involving the replacement of air compressors.  (ROA.1090;ROA.106-07, 329-32.)  After Luminant informed the Company that the project was delayed, the Company issued a layoff notice to Smith on July 16, and to Mendez on July 20, citing in each one a lack of work.  The Company did not notify the Union in advance of these layoffs, nor did it provide the Union with an opportunity to bargain over them.  (ROA.1083, 1094;ROA.64, 136-39, 180, 224.)

### E. Four Months After the Union's Certification, the Company Agrees To Recognize and Bargain with the Union and Thereafter Supplies Some, But Not All, of the Information the Union Had Requested Months Earlier

On September 24, the Board denied the Company's request for review of the Regional Director's Decision and Direction of Election finding, among other

things, that the outage employees were properly excluded from the bargaining unit as temporary employees. (ROA.1093;ROA.50, 465.) On October 2, after an exchange of emails and phone calls, the Company agreed to recognize and bargain with the Union. The parties thereafter agreed to meet on November 18, and to begin formal negotiations for a collective-bargaining agreement on November 20. (ROA.1094;ROA.50-53, 75-76, 316, 471, 473, 475.)

In advance of the scheduled November 20 bargaining session, the Company provided some of the information requested by the Union on June 22 and informed the Union that it would send additional material. In mid-November, the Union provided the Company with a list of information that was still outstanding. In reply, the Company asserted for the first time that the outstanding information was irrelevant or confidential. When the Union asked the Company to specifically identify the alleged irrelevant or confidential items, the Company never responded. (ROA.1094;ROA.53-54, 79, 483-609.)

Around the time of the parties' first bargaining session on November 20, the Company provided the Union with some information responsive to the Union's separate June 25 request. Upon receipt, the Union informed the Company that the provided information "still leaves a lot of questions unanswered." The Company never replied. (ROA.1094;ROA.53-57, 610-12.)

In late December, the Company provided the Union with additional responses to its June 22 information request.  On January 27, 2021, the Union acknowledged the Company's partial responses to its summer 2020 information requests and listed still-outstanding items.  The Company has not provided any of those items.  (ROA.1094 and n.21;ROA.58-60, 300-01, 613-796.)

## II.     THE BOARD'S CONCLUSIONS AND ORDER

On the foregoing credited facts, the Board (Members Kaplan, Wilcox, and Prouty) found, in agreement with the administrative law judge, that the Company violated Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), by threatening employees with job loss, and violated Section 8(a)(5) and (1) of the Act, 29 U.S.C. § 158(a)(5) and (1), by failing to recognize and bargain with the Union, and by failing to furnish and/or unreasonably delaying in furnishing the Union with requested, relevant, and necessary information.  A majority of the Board (Members Wilcox and Prouty; Member Kaplan dissenting) further found in agreement with the judge that the Company violated Section 8(a)(5) and (1) of the Act by laying off employees Smith and Mendez without giving the Union prior notice and an opportunity to bargain.  (ROA.1082-89.)

The Board's Order requires the Company to cease and desist from the unfair labor practices found and from, in any like or related manner, interfering with, restraining, or coercing employees in the exercise of their rights under Section 7 of

the Act, 29 U.S.C. § 157.  Affirmatively, the Order requires the Company to:  offer

Smith and Mendez reinstatement to their former jobs or to substantially equivalent

positions if those jobs no longer exist; make them whole for any loss of earnings

and benefits; compensate them for any adverse tax consequences of a lump-sum

backpay award; remove from its files any reference to the unlawful layoffs;

recognize and, on request, bargain with the Union; furnish in a timely manner the

information requested by the Union on June 22 and 25, 2020, to the extent that it

has not already done so; and post a remedial notice.  (ROA.1086.)

## STANDARD OF REVIEW

The Court will enforce the Board's decision if it is reasonable and supported

by substantial evidence on the record as a whole.  *Strand Theatre of Shreveport*

*Corp. v. NLRB*, 493 F.3d 515, 518 (5th Cir. 2007); *see* 29 U.S.C. § 160(e);

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).  Substantial evidence

is simply "'such relevant evidence as a reasonable mind would accept to support a

conclusion.'"  *J. Vallery Elec., Inc. v. NLRB*, 337 F.3d 446, 450 (5th Cir. 2003)

(quoting *Universal Camera*, 340 U.S. at 477); *accord Allentown Mack Sales &*

*Serv., Inc. v. NLRB*, 522 U.S. 359, 377 (1998) (substantial evidence means the

degree of evidence that "*could* satisfy a reasonable factfinder" (emphasis in

original)).  The Court will only conclude that a finding of fact made by the Board

is unsupported by substantial evidence "in the most rare and unusual cases."  *Flex*

*Frac Logistics, LLC v. NLRB*, <u>746 F.3d 205, 208</u> (5th Cir. 2014). Similarly, reasonable inferences drawn by the Board from its findings of fact will not be displaced by the Court, even if the Court might have reached a different conclusion had the matter been before it de novo. *United Supermarkets, Inc. v. NLRB*, <u>862 F.2d 549, 551-52</u> (5th Cir. 1989); *see NLRB v. Link-Belt Co.*, <u>311 U.S. 584, 597</u> (1941). In sum, the Court will not "reweigh the evidence, try the case de novo, or substitute [its] judgment for that of the Board." *El Paso Elec. Co. v. NLRB*, <u>681 F.3d 651, 656-57</u> (5th Cir. 2012) (citation omitted).

## SUMMARY OF ARGUMENT

Before the Court, the Company fails to challenge the Board's finding that it violated Section 8(a)(5) and (1) of the Act by failing to furnish and/or timely furnish the Union with requested information. The Board is therefore entitled to summary enforcement of the corresponding portions of its Order.

Next, substantial evidence supports the Board's finding that the Company violated Section 8(a)(1) of the Act by threatening employees with job loss if they voted for union representation. Specifically, the evidence establishes that an admitted company agent and supervisor told employees that voting for union representation in an upcoming election would result in job loss within six months and loss of the contract that allowed for their employment. The Board reasonably found that these statements, given the context, would reasonably tend to interfere

with employees' rights under the Act to engage in union activity. Contrary to the Company's contention, the Board further reasonably found that the threatening nature of the statements, and the Company's failure to provide objective factual support for its "prediction" of job loss if employees elected the Union, deprived the statements of the protection granted to non-threatening, non-coercive statements under Section 8(c) of the Act.

Substantial evidence also supports the Board's finding that the Company violated Section 8(a)(5) and (1) of the Act by refusing to recognize and bargain with the Union after its certification. Here, the Company concedes that after the Board certified the Union as the employees' bargaining representative it refused, for nearly four months, the Union's request for recognition and to begin bargaining. Contrary to the Company's contention, its actions are not excused pending any review of the Board's decision to certify the Union. Rather, under settled law, including precedent in this Court, the Company acted at its peril pending review and now must bear the consequences of its failed challenge to the Union's certification.

Finally, substantial evidence supports the Board's finding that the Company violated Section 8(a)(5) and (1) of the Act by unilaterally laying off two employees. The Company concedes that it did not bargain over the layoffs, but argues that a past practice privileged its unilateral action. The Board reasonably

rejected that claim, finding that the Company did not meet its burden of establishing the existence of a past practice applicable to these two layoffs. Specifically, the Board appropriately found that the layoff of the two employees at issue—due to a project delay—was different in kind from the prior layoffs of three other employees because of a shutdown of operations stemming from the unprecedented and unforeseeable COVID-19 pandemic. The Board further found that a remaining past layoff of a single employee for lack of work was insufficient, standing alone, to establish a pattern of past layoffs that employees could reasonably expect to recur on a consistent basis. Likewise, substantial evidence supports the Board's finding that ambiguous provisions of the Company's employment agreements and handbook, which were silent on the specific issue of layoffs, were insufficient to establish any past practice applicable to the two layoffs here.

## ARGUMENT

I.  **THE BOARD IS ENTITLED TO SUMMARY ENFORCEMENT OF THE PORTIONS OF ITS ORDER CORRESPONDING TO THE UNCONTESTED FINDING THAT THE COMPANY VIOLATED THE ACT BY FAILING TO FURNISH AND/OR TIMELY FURNISH THE UNION WITH REQUESTED INFORMATION**

In its opening brief, the Company does not challenge the Board's finding that it violated Section 8(a)(5) and (1) of the Act, 29 U.S.C. § 158(a)(1), by failing to furnish and/or unreasonably delaying in furnishing necessary and relevant

information requested by the Union regarding the Company's wages, benefits, and COVID-19 procedures. *See generally NLRB v. Acme Indus. Co.*, 385 U.S. 432, 435-36 (1967) (employer's failure to timely provide employees' representative with relevant information upon request violates Section 8(a)(5) and (1) of the Act); *NLRB v. CJC Holdings, Inc.*, 97 F.3d 114, 117 (5th Cir. 1996) (same). By failing to address the violation in its opening brief, the Company has waived any argument against the Board's unfair-labor practice finding. *Remington Lodging & Hospitality, LLC. v. NLRB*, 847 F.3d 180, 186 n.24 (5th Cir. 2017); *El Paso Elec.*, 681 F.3d at 658. Accordingly, the Board is entitled to summary enforcement of the portions of its Order remedying the uncontested violation. *T-Mobile USA, Inc. v. NLRB*, 865 F.3d 265, 269 n.3 (5th Cir. 2017); *Remington*, 847 F.3d at 186 n.24.

## II. SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING THAT THE COMPANY VIOLATED SECTION 8(a)(1) OF THE ACT BY THREATENING EMPLOYEES WITH JOB LOSS IF THEY VOTED FOR UNION REPRESENTATION

### A. The Act Prohibits an Employer from Engaging in Conduct that Has a Reasonable Tendency To Coerce Employees in the Exercise of Their Statutory Rights To Organize and Support a Union

Section 7 of the Act guarantees employees the "right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining . . . ." 29 U.S.C. § 157. Section 8(a)(1) of

the Act enforces Section 7's guarantees by making it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise" of their Section 7 rights. 29 U.S.C. § 158(a)(1). It is settled that an employer violates Section 8(a)(1) of the Act by threatening employees with job loss or layoffs if they select a union as their bargaining representative. *See NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969); *NLRB v. McCullough Envtl. Servs.*, 5 F.3d 923, 929-30 (5th Cir. 1993).

The test for whether an employer's conduct violates Section 8(a)(1) is an objective one: whether, under the totality of the circumstances, the conduct has a reasonable tendency to coerce or interfere with employees' rights, not whether employees are actually coerced. *See NLRB v. Brookwood Furniture, Div. of U.S. Indus.*, 701 F.2d 452, 459 (5th Cir. 1983); *TRW-United Greenfield Div. v. NLRB*, 637 F.2d 410, 415 (5th Cir. 1981). In applying this test, the Board considers "the economic dependence of employees on their employer, and the necessary tendency of the former . . . to pick up the intended implications of the latter that might be more readily dismissed by a more disinterested ear." *Gissel*, 395 U.S. at 617; *accord Tellepsen Pipeline Servs. Co. v. NLRB*, 320 F.3d 554, 562 (5th Cir. 2003).

> **B. Employees Would Reasonably Construe Company Superintendent Bales' Statements as a Threat of Job Loss if They Selected the Union As Their Collective-Bargaining Representative**

Substantial evidence supports the Board's finding that the Company violated

16

Section 8(a)(1) of the Act "by threatening employees with job loss if they selected the Union as their bargaining representative." (ROA.1082.) Specifically, the documentary evidence in the record shows that Site Superintendent Bales—an admitted agent and supervisor (ROA.177, 222), and a high-ranking company official at the facility—warned employees within one month of the representation election that "if this group . . . tries to go union, I do not believe that anybody in this room will have a job in six months," and that "the client will pick another contractor" who will not hire any of the current employees and "this will be the last time this group is together like it is now." (ROA.1082 n.4, 1095;ROA.317-26.)

As has long been recognized, employees are "particularly sensitive" to suggestions of plant closings or job loss that might follow from unionization, and reasonably "take such hints as coercive threats rather than honest forecasts." *Gissel*, 395 U.S. at 619; *e.g.*, *Care One at Madison Ave., LLC*, 832 F.3d 351, 361 (D.C. Cir. 2016) (refusing to second-guess the Board's reasonable finding as to the unlawful coercive effect of an employer pamphlet warning that strike could "jeopardize" employees' jobs). And here, the record shows far more than a mere hint: in his speech to employees, Bales repeatedly drew a direct, causal link between a vote for union representation and job loss, even going so far as to assert that if the employees unionized, they would not have their jobs "in six months."

Given the obviously threatening nature of Bales' statements, the Board was

fully warranted in finding that they would "reasonably tend[] to restrain, coerce, or interfere with a variety of unit employees' rights guaranteed under Section 7," and accordingly that the Company violated Section 8(a)(1) of the Act.  (ROA.1095.) The Board's finding is consistent with this Court's precedent.  *See Tellepsen Pipeline Servs.*, 320 F.3d at 559, 564 (unlawful threat where employer stated that customer "could terminate" the employer's contract "if the [u]nion won the vote," and all of its "employees could possibly lose their jobs").

### C. The Company's Contentions Are Without Merit

#### 1. The Board's finding is not based on "suspicion and conjecture"

The Company errs (Br. 17, 41-42) in claiming that the Board's amply supported threat finding is based on mere "suspicion and conjecture" because relevant details about who was speaking and the context of the statements are allegedly lacking in the record.  Contrary to the Company's claims and as the Board found, the admittedly authentic transcript and recording of the meeting (ROA.38-42) amply establish the relevant circumstances, "most notably that Bales was clearly speaking to unit employees about the upcoming election."  (ROA.1082 n.4.)

Preliminarily, the transcript of the meeting—entered into the record by stipulation (ROA.38-42,ROA.319-28)—shows that Bales unambiguously identified himself as the speaker in the course of his unlawful remarks.  Thus,

Bales told the employees that what he was saying was "from Jerry Bales." (ROA.321.)  In addition, Bales explicitly placed his remarks in temporal context: he informed employees that he was speaking to them against the background of "all of the sessions" they had already had with the Company about the Union prior to the election.  (ROA.319, 321.)  Given the strong evidence of context provided in the transcript itself, the Board correctly rejected (ROA.1082 n.4) the Company's suggestion, which it renews here (Br. 17, 42), that relevant contextual evidence is missing in the record.  In any event, the Company tellingly does not say what further context is necessary, or how it might have affected the analysis of Bales' threats.  Accordingly, there is no basis to disturb the Board's finding that the transcript and recording of Bales' remarks amply support the finding that Bales unlawfully threatened employees with job loss.

Moreover, there is no merit to the Company's vague suggestion (Br. 42) that, as in *Brown and Root, Inc. v. NLRB*, 333 F.3d 628 (5th Cir. 2003), and *Selikirk Metalbestos, North America, Eljer Mfg. v. NLRB*, 116 F.3d 782 (5th Cir. 1997), further exploration of the background of the remarks might have rendered them benign.  Unlike Bales, the employer officials in those cases made no specific threats of job loss, and their statements reasonably prompted a broader examination of context precisely because they were not overtly threatening.

Thus, in *Brown and Root*, the employer informed employees of a prior unionized contractor that they could apply for employment with the employer, given its assumption of the prior contractor's work, but that its employees at the facility would remain nonunion. On close examination of the surrounding context, the Court held that the statement was not a threat but a statement of fact, because the formerly unionized workers would make up only a minority of the employer's total workforce at the facility and therefore could not force unionization under settled law. 333 F.3d at 635-636.

In *Selikirk Metalbestos* the employer made only a vague statement of "negative consequences" for failure to support a union decertification effort and also assured employees that they would not face retaliation based on how they voted. In those specific circumstances, the Court declined to "imbue" the employer's "negative consequences" comment "with a more sinister meaning." *Id*. at 789. Here, by contrast, Bales made specific threats of job loss as the consequence of unionization, in the weeks before a representation election. The Board did not "imbue" his statements with a sinister meaning as in *Selikirk*; rather, they had a sinister meaning on their face.

> 2. **The Company's statements are not protected under Section 8(c) of the Act**
>
> > a. **Section 8(c) does not protect threats directed at employees' statutorily protected activity, and to avoid unlawful coercion of employees, even predictions**

**about the negative economic effects of unionization must be based on objective fact**

Consistent with Section 8(a)(1)'s ban on interference, threats, and coercion directed at protected union activity, Section 8(c) of the Act provides that an employer may state its opinion about unionization, but only if its statement does not contain an express or implied "threat of reprisal . . . or promise of benefit." 29 U.S.C. § 158(c); *see Gissel*, 395 U.S. at 617-18. Accordingly, if an employer chooses to make an economic prediction regarding the consequences of unionization, "the prediction must be carefully phrased on the basis of objective fact" and "convey an employer's belief as to demonstrably probable consequences beyond [its] control." *Gissel*, 395 U.S. at 618; *accord TRW-United*, 637 F.2d at 419. As the Court has stated, "[e]conomic predictions by employers are particularly subject to abuse." *NLRB v. Kaiser Agric. Chems.*, 473 F.2d 374, 381 (5th Cir. 1973). Thus, "an employer's conveyance of his prediction of belief, however sincere, that loss of jobs may result from unionization, is not a statement of fact unless it is capable of proof based on objective fact." *Tellepsen Pipeline Servs.*, 320 F.3d at 563.

**b.    The Company has not established that its threats of job loss were mere predictions based on objective fact**

Here, contrary to the Company's argument (Br. 18, 43-49), Bales' threats of job loss were not protected by Section 8(c) as "carefully phrased" predictions

based on "demonstrably probable consequences beyond [the Company's] control." *Gissel*, 395 U.S. at 618. Preliminarily, the record discloses no objective factual basis for Bales' highly specific "prediction" that all of the employees would lose their jobs "in six months" if they "trie[d] to go union." (ROA.1082 n.4.) Unsurprisingly, therefore, the Company does not attempt to suggest that there was any "objectively verifiable" basis for that precise prediction that could trigger protection under Section 8(c). *Brown & Root*, 333 F.3d at 633.

Instead, the Company focuses (Br. 45-47) on Bales' separate statement that "if we go union . . . the client will pick another contractor to come in here and bring their own people." The Company argues (Br. 45-46) that this aspect of Bales' statements had an objective basis in "[p]ast experience and direct statements from Luminant executives that Luminant would cancel the contract with a unionized contractor." However, the Company's argument is unsupported by the record. There is no evidence that Luminant ever told the Company that it would, or even could, cancel its contract if the Company's employees unionized. Nor is there any evidence that Luminant has ever canceled a contract in response to a unionization effort, or even clear evidence that the contract could be terminated before the end of its stated five-year term.

Accordingly, the only alleged support for Bales' projection regarding contract loss is his own disjointed recollection of various conversations—with

unnamed people, at unspecified times—about Luminant's purported anti-union sentiments. Specifically, Bales recalled hearing unnamed officials from Luminant stating that they wanted the maintenance group "to remain nonunion" and he also recalled hearing unnamed officials from the Company opine that because Luminant has no union jobs it would lose the Luminant contract if employees unionized. (ROA.322-23.) The problem for the Company, however, is that the prediction Bales ultimately made to employees did not hew to even these vague, hearsay statements. He ventured well beyond anything he had purportedly heard from Luminant and Company officials, and confidently asserted that "the client will pick another contractor" if employees opted for union representation. (ROA.323.)

As the Board correctly found, this "amounted to advocacy" for the unsupported view that employees had to refrain from unionizing in order to keep their jobs. (ROA.1095.) It plainly did not constitute a permissible prediction "carefully phrased on the basis of objective fact" to convey Bales' beliefs about "demonstrably probable consequences beyond [the Company's] control." (ROA.1082 n.4, ROA.1095.) *Gissel*, 395 U.S. at 618. Thus, the record amply supports the Board's conclusion that, contrary to the Company's contention, "Bales' statements were not protected by Sec[tion] 8(c)."[4] (ROA.1082 n.4.)

---

[4] In its brief, the Company quibbles (Br. 44-45) with the Board's statement that "the employer has the burden of proving that its prediction is based on objective

Far from ignoring the important distinction between unlawful threats and lawful predictions as the Company claims (Br. 46), the Board showed a keen awareness of the relevant *Gissel* standard, as shown above, and it relied on factually apposite cases in applying that standard here. (ROA.1082 n.4, citing *Hogan Transports*, 363 NLRB 1980, 1980-83 (2016) (employer's statements—that employees would lose their jobs if they unionized because its only customer was nonunion and it operated with nonunion carriers at other locations—were not protected by Section 8(c) because there was no evidence the customer ever conveyed that it even might cancel the contract if employees unionized), and *UXB Int'l*, 321 NLRB 446, 446, 452 (1996) (finding unlawful statements that "[i]n my opinion, if the [u]nion is voted in, [the employer] will lose the contract . . . and all of us will be out of a job if that happens").)

---

fact." (ROA.1082 n.4.) However, this statement follows from settled Board precedent, *see Hogan Transports, Inc.*, 363 NLRB 1980, 1981 (2016), *Schaumburg Hyundai, Inc.*, 318 NLRB 449, 450 (1995), and is consistent with precedent in this Court stating that an employer must "convey[] sufficient objective facts for [its] workforce to conclude that [its] prediction was based on circumstances outside the [employer's] control." *Tellepsen Pipeline Servs., Co.*, 320 F.3d at 564. Although the Company interprets (Br. 44) one out-of-circuit case, *NLRB v. Pentre, Elec., Inc*., 998 F.2d 363, 368-71 (6th Cir. 1993), as articulating a contrary rule, subsequent cases in that circuit have clarified that the court "still requires an employer's statements to have the support of precise objective facts." *DTR Indus. v. NLRB*, 39 F.3d 106, 114 (6th Cir. 1994); *see also ITT Automotive v. NLRB*, 188 F.3d 375, 386 n.8 (6th Cir. 1999) (an employer's statements must "have the support of precise objective facts" to invoke the potential safe harbor of Section 8(c) of the Act).

Likewise, there is no merit to the Company's claim (Br. 43, 46-47) that an employer's prediction is protected under Section 8(c) so long as the employer merely opines on a third party's actions, without itself threatening to retaliate against employees. This claim wholly misunderstands *Gissel*. As the cases cited by the Company (Br. 46-48) show, predictions about the actions of a third party are *only* protected by Section 8(c) if they are "carefully phrased on the basis of objective fact to convey the employer's belief as to demonstrably probable consequences beyond his control."[5] *Gissel*, 395 U.S. at 618. Thus, where, as here and in *Hogan Transports, Inc*., 363 NLRB 1980 (2016), and *UXB International*,

---

[5] The cited cases (Br. 46-48) involved employer statements that were protected by Section 8(c) because they were devoid of any threats and, at most, constituted predictions grounded in objective fact. *See*, *e.g.*, *NLRB v. Brownwood Mfg. Co.*, 363 F.3d 136, 138 (5th Cir. 1996) (employer based its comments on "competitive conditions"); *Texas Industries, Inc. v. NLRB*, 336 F.2d 128, 131 (5th Cir. 1964) (employer stated its legal rights under the Act regarding how it could respond to a strike); *NLRB v. Transportation Clearings, Inc.*, 311 F.2d 519, 523-24 (5th Cir. 1962) (employer's statements flowed "solely from a union's policy or practices" not unionization itself); *DTR Indus., Inc. v NLRB*, 39 F.3d at 109-10, 114-15 (6th Cir. 1994) (employer discussed, with specific supporting details, the economic impact unionization could have on its business as a sole source auto supplier); *Patsy Bee, Inc. v. NLRB*, 654 F.2d 515, 516-17 (8th Cir. 1981) (employer had an objective basis for comparing its plant to others that had failed: the "established policies" of its two largest customers were to end their contracts with employers who went union); *TNT Logistics North America, Inc.*, 345 NLRB, 290, 291 (2005) (employer described the options the customer would have once its contract with the employer expired); *Curwood, Inc.*, 339 NLRB 1137, 1137-38 (2003) (employer informed employees of specific concerns customers had raised about work stoppages if they unionized); *Pinkerton, Inc.*, 309 NLRB 723, 723 (1992) (employer merely cautioned that it needed to remain competitive, but made no predictions).

[321 NLRB 446](#) (1996), an employer states *without an objective basis* that job loss will occur due to actions of a customer or client, its expression is an unlawful threat, outside the protection of Section 8(c). Were it otherwise, as the Board stated in *Hogan Transports*, "a customer's history of antiunionism coupled with a contract that is silent on unionization but terminable at some future date would supply an objective basis for virtually any employer prediction as to the effects of unionization." [363 NLRB at 1982](#) n.8.

## III. SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING THAT THE COMPANY VIOLATED SECTION 8(a)(5) AND (1) OF THE ACT BY REFUSING TO RECOGNIZE AND BARGAIN WITH THE UNION AS THE EMPLOYEES' COLLECTIVE-BARGAINING REPRESENTATIVE, AND BY UNILATERALLY LAYING OFF TWO UNIT EMPLOYEES

### A. An Employer Has a Statutory Duty To Bargain With Its Employees' Chosen Representative; It Violates the Act by Refusing to Bargain, and by Unilaterally Changing Employees' Terms and Conditions of Employment

Section 8(a)(5) of the Act makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." [29 U.S.C. § 158(a)(5)](#).[6] In turn, Section 8(d) of the Act defines collective bargaining as "the mutual obligation of the employer and the representative of the employees

_____

[6] A Section 8(a)(5) violation produces a derivative violation of Section 8(a)(1). *Allied Chem. & Alkali Workers of America v. Pittsburgh Plate Glass Co.*, [404 U.S. 157, 163](#) n.6 (1971).

26

to meet . . . and confer in good faith with respect to wages, hours, and other terms and conditions of employment . . . ." 29 U.S.C. § 158(d).  These provisions mandate bargaining over "wages, hours, and other terms and conditions of employment."  *NLRB v. Wooster Div.*, 356 U.S. 342, 349 (1958).

It is well settled that the bargaining obligation created by the above provisions encompasses a duty to refrain from making unilateral changes as to any mandatory bargaining subject.  *NLRB v. W.R. Grace & Co.*, 571 F.2d 279, 282 (5th Cir. 1978); *Laney & Duke Storage Warehouse Co.*, 151 NLRB 248, 266-67 (1965), *enforced in relevant part*, *NLRB v. Laney & Duke Storage Warehouse Co.*, 369 F.2d 859 (5th Cir. 1966).  As the Supreme Court explained in *NLRB v. Katz*, 369 U.S. 736, 743 (1962), an employer's unilateral change in the terms and conditions of employment violates Section 8(a)(5) "much as does a flat refusal" to bargain, because it similarly represents "a circumvention of the duty to negotiate which frustrates the objectives" of the Act.  In effect, a unilateral change "minimizes the influence of organized bargaining" and "interferes with the right of self-organization by emphasizing to the employees that there is no necessity for a collective-bargaining agent."  *May Dept. Stores Co. v. NLRB*, 326 U.S. 376, 385 (1945).  Accordingly, good-faith compliance with Section 8(a)(5) "'presupposes that the employer will not alter existing 'conditions of employment' without *first* consulting the exclusive bargaining representative[] selected by the employees, and

giving it an opportunity to negotiate on any proposed changes.'" *Howmet Corp.*, 197 NLRB 471, 485 n.34 (1972) (quoting *Armstrong Cork Co. v. NLRB*, 211 F.2d 843, 847 (5th Cir. 1954), and adding emphasis).

Settled law also holds that absent "compelling economic circumstances" not present here, an employer's bargaining obligation commences on the date of the union's victory in a Board-conducted election. *Mike O'Connor Chevrolet*, 209 NLRB 701, 703 (1974), *enforcement denied on other grounds*, 512 F.2d 684 (8th Cir. 1975); *accord Advertisers Mfg. Co. v. NLRB*, 677 F.2d 544, 547 (7th Cir. 1982); *NLRB v. Sandpaper Convalescent Ctr.*, 824 F.2d 318, 320-21 (4th Cir. 1987); *see e.g. W.R. Grace & Co.*, 571 F.2d at 282. It is further well settled that "an employer is not relieved of that obligation pending Board consideration, or reconsideration, of a request for review" of a certification of bargaining representative issued after an election. *Benchmark Indus., Inc.*, 262 NLRB 247, 248 (1982), *enforced mem.*, 724 F.2d 974 (5th Cir. 1984); *accord Audio Visual Servs. Grp., Inc.*, 365 NLRB No. 84, slip op. at 2 (2017); *L. Suzio Concrete Co.*, 325 NLRB 392, 396 (1998), *enforced mem.*, 173 F.3d 844 (2d Cir. 1999); *Madison Detective Bureau, Inc.*, 250 NLRB 398, 399 (1980). Accordingly, an employer who relies on its filing of a request for review in refusing to bargain with the certified union acts at its peril. *See NLRB v. Allis-Chalmers Corp.*, 601 F.2d 870, 874 (5th Cir. 1979); *NLRB v. W.R. Grace & Co.*, 571 F.2d at 282; *Laney & Duke*

*Storage Warehouse Co.*, 369 F.2d at 869; *Volkswagen Grp. of America, Inc.*, 364 NLRB No. 110, slip op. at 2 n.4 (2016); *L. Suzio Concrete Co.*, 325 NLRB at 396.

## B. The Company Unlawfully Refused To Recognize and Bargain with the Union

The Company acknowledges (Br. 1-2) that, despite the May 29 tally of ballots establishing that the Union won the election, and the subsequent June 8 certification of the Union as the employees' exclusive collective-bargaining representative, it refused to recognize and bargain with the Union until October 2, 2020. Accordingly, the record amply supports the Board's finding (ROA.1096) that the Company violated Section 8(a)(5) and (1) of the Act by refusing "to recognize and bargain with the union for nearly 4 months after the Union was certified." *See Bemis Co.*, 370 NLRB No. 7, slip op. at 3, 32-34 (2020); *Rose Fence, Inc.*, 359 NLRB 225, 229 (2012), *reaffirmed*, 361 NLRB 1198 (2014).

Contrary to the Company's contention (Br. 49-53), the Board's adherence to settled law that the obligation to recognize and bargain with a union attaches with certification, and that an employer acts at its peril in disregarding that obligation, was not error. To be sure, an employer has a right to seek review, including judicial review, of a union's certification.[7] But if, as here, the process of review

---

[7] Under the Act, there is no direct judicial review of the Board's certification of a union. In order to obtain judicial review, an employer must refuse to bargain, triggering an unfair-labor-practice proceeding that operates as a test of the

does not vindicate the employer's position regarding the certification, the employer

is liable for its refusal to recognize and bargain from the inception of the

bargaining obligation. *See Allis-Chalmers Corp.*, 601 F.2d at 874; *W.R. Grace &*

*Co.*, 571 F.2d at 282; *see also Technicolor Gov't Servs., Inc. v. NLRB*, 739 F.2d

323, 326-27 (8th Cir. 1984); *King Radio Corp. v. NLRB*, 398 F.2d 14, 20 (10th Cir.

1968). Although the Company purports to challenge this sensible, longstanding,

and court-approved doctrine as contrary to the Act, it cites no case supportive of its

view.[8]

---

certification. *See NLRB v. Downtown BID Servs. Corp.*, 682 F.3d 109, 112 (D.C. Cir. 2012) (refusal to bargain "sets up judicial review of an election certification that is otherwise insulated from direct review"); *NLRB v. S.R.D.C., Inc.*, 45 F.3d 328, 330 n.2 (9th Cir. 1995) (explaining test-of-certification procedure). Only by following this procedure, which results in the issuance of a final Board unfair-labor-practice order reviewable by the courts under Section 10(e) and (f) of the Act (29 U.S.C. § 160(e) and (f)), can an employer secure judicial review of the certification and the record upon which it was based. *See Boire v. Greyhound Corp.*, 376 U.S. 473, 477-79 (1964).

[8] The Company instead suggests (Br. 52) that the Board's decision in *NP Palace LLC*, 368 NLRB No. 148 (2019), *review denied*, 1 F.4th 12 (D.C. Cir. 2021), provides a useful analogy because the Board there allegedly recognized that an employer should not have to choose between bargaining over a union information request and pursuing a challenge to the bargaining obligation. The Company greatly overreads *NP Palace*. In that case, the Board in no way signaled a departure from the general principle that, in the face of a certification, an employer must either bargain or refuse to bargain, *see Terrace Gardens Plaza, Inc. v. NLRB*, 91 F.3d 222, 225-26 (D.C. Cir. 1996), and acts at its peril if it chooses the latter course. On the contrary, the Board reaffirmed that general principle, 368 NLRB No. 148, slip op. at 5 and n.16, and merely recognized that in the special circumstance where an employer raises a legitimate defense to the disclosure of information requested by a union, while also contesting the union's certification, it

Nor is the Company's position supported by logic. Allowing an employer to both bargain and simultaneously contest the bargaining obligation as the Company proposes would invite dangers for the statutory bargaining process. It would allow the employer to "'box the union in'" on future bargaining positions while the certification hangs in the balance—thereby undercutting and undermining the union. *NLRB v. Westinghouse Broadcasting & Cable, Inc.*, 849 F.2d 15, 20-22 (1st Cir. 1988) (quoting *Mike O'Connor Chevrolet*, 209 NLRB 701, 703-04 (1974)); *accord Ozburn-Hessey Logistics, LLC v. NLRB*, 939 F3d 777, 789 (6th Cir. 2019); *Contemporary Cars, Inc. v. NLRB*, 814 F.3d 859, 877 (7th Cir. 2016). The Board appropriately avoided any such danger by simply adhering to settled law and finding that the Company, having refused to bargain in order to mount a challenge to the Union's certification, must bear the consequences of its failed challenge.

### C. The Company Unlawfully Laid Off Two Bargaining-Unit Employees

It is well settled that layoffs for economic reasons—which inherently affect employees' working conditions—are a mandatory subject of bargaining and are subject to the general rule against unilateral changes discussed above p. 27. *See*

---

may seek accommodative bargaining as to the information subject to its defense—in order to preserve that defense, and without forfeiting its overall position that it has no obligation to bargain with the union. 368 NLRB No. 148, slip op. at 1, 5. That special circumstance, of course, is not implicated in this case.

*W.R. Grace & Co.*, 571 F.2d at 282 (economic considerations do not permit an employer to unilaterally change its operations and lay off employees); *NLRB v. Advertisers Mfg., Co.*, 823 F.2d 1086, 1090 (7th Cir. 1987) (layoffs work a "dramatic change" in working conditions and cannot be unilaterally implemented). Accordingly, like any unilateral action, unilateral layoffs constitute a breach of the bargaining obligation set forth in Section 8(d) of the Act and violate Section 8(a)(5) and (1) of the Act. *Bemis Co., Inc.*, 370 NLRB No. 7, slip op. at 3, 32-34); *Rose Fence*, 359 NLRB at 229.

Here, it is undisputed that, following a project delay announced by Luminant in July 2020, the Company laid off two unit employees on the affected project, Smith and Mendez, without notifying the Union in advance or providing it with an opportunity to bargain over the layoffs. (ROA.138-39, 180, 224.) Substantial evidence supports the Board's finding (ROA.1085) that these unilateral layoffs violated Section 8(a)(5) and (1) of the Act. *See W.R. Grace*, 571 F.2d at 282; *Adair Standish Corp. v. NLRB*, 912 F.2d 854, 863-64 (6th Cir. 1990); *Local 512, Warehouse & Off. Workers' Union v. NLRB*, 795 F.2d 705, 711 (9th Cir. 1986).

Consistent with settled law, the Board found the violation only after carefully considering the Company's argument and its supporting evidence for the proposition that its layoffs hewed to past practice and therefore were not changes to the status quo. As shown below, the Board reasonably rejected the Company's

argument, finding that the evidence fell short of establishing a relevant past practice. Although the Company now challenges the Board's finding, it fails to establish—as it must under substantial-evidence review—that the record compels its interpretation of the evidence rather than the Board's. *See Flex Frac Logistics, LLC*, 746 F.3d at 208.

### 1. The Company failed to establish a past practice of laying off employees in response to project delays

#### a. To make out a past practice, the employer must show a regular and frequent pattern of past actions that are similar in kind and degree to the disputed action

The statutory duty to bargain and refrain from making unilateral changes, *see NLRB v. Katz*, 369 U.S. 736, 743, 746 (1962), includes an obligation to adhere to any established past practice. *See*, *e.g.*, *Daily News of Los Angeles*, 315 NLRB 1236, 1239 (1994) (periodic wage increases that are "an established practice . . . regularly expected by the employees" can become part of their employment conditions), *enforced*, 73 F.3d 406 (D.C. Cir 1996). The Board defines a past practice as "an activity that has been satisfactorily established by practice or custom; an established practice or an established condition of employment." *Exxon Shipping Co.*, 291 NLRB 489, 493 (1988) (internal quotations omitted).

In determining whether a given change is consistent with past practice, and therefore not a change at all, the Board considers the precise contours of both the asserted past practice and the asserted change. Thus, the critical preliminary

question is "whether the employer's action is similar in kind and degree to what the employer did in the past." *Raytheon Network Centric Sys.*, 365 NLRB No. 161, slip op. at 13 (2017). Only if the employer's action "did not materially vary in kind or degree" from past actions does a past-practice defense potentially apply. *Id*. But even then, the employer must prove not only similarity of kind and degree between current and past actions, but also a "practice [that] occurred with such regularity and frequency that employees could reasonably expect the practice to reoccur on a consistent basis." *Mike-Sell's Potato Chip Co.*, 368 NLRB No. 145, slip op. 3 (2019); *accord Bemis Co.*, 370 NLRB No. 7, slip op. at 32; *Palm Beach Metro Transp., LLC*, 327 NLRB 180, 184 (2011); *enforced mem.*, 459 F. App'x 874 (11th Cir. 2012). In short, in order to prevail, the employer must show that its action was in conformity with an established pattern of activity, rather than unfettered discretion. *See Quality Health Servs. of P.R., Inc. v. NLRB*, 873 F.3d 375, 385-86 (1st Cir. 2017); *Eugene Iovine*, *Inc*., 328 NLRB 294, 294 (1999), *enforced mem.*, 1 F. App'x 8 (2d Cir. 2001).

Under settled law, including precedent in this Circuit, an employer that asserts a past practice as a defense to a charge that it has unilaterally changed employees' terms and conditions of employment carries the burden of proving such practice. *Allis-Chalmers Corp.*, 601 F.2d at 875; *Quality Health Servs. of P.R., Inc.*, 873 F.3d at 385-86 (1st Cir. 2017); *City Cab Co. of Orlando, Inc. v.*

*NLRB*, [787 F2d 1475, 1478](#) (11th Cir. 1986); *Mike-Sell's Potato Chip Co.*, [360](#)

[NLRB 131, 138-39](#) (2014), *enforced*, [807 F.3d 318](#) (D.C. Cir. 2015); *Eugene*

*Iovine, Inc.*, [328 NLRB at 294](#).[9]

### b. The Company's prior layoffs do not establish a past practice

In support of its argument that its layoffs of Smith and Mendez were

consistent with a past practice, the Company (Br. 16-17, 32-38) relies on its layoffs

of three lake employees in the Spring of 2020—Teresa Milton, Bradley Sutter, and

James Foos.[10] The Board reasonably found, however, that those layoffs were

---

[9] There is no merit to the Company's suggestion (Br. 20) that the Board "excused" the General Counsel from her burden of proof by insisting, consistent with settled law, that the Company present sufficient evidence to prove its past-practice claim. Contrary to the Company's suggestion, placing the limited burden of proving a past practice—including relevant company policies—on the party asserting the past practice does not subvert the usual rule that, in litigating a complaint before the Board, the General Counsel has the burden of proving the alleged unfair labor practice. See [29 U.S.C. § 153(d)](#) (generally describing the General Counsel's role); *PG Publishing Co.*, 368 NLRB No. 41, slip op. at 4 (2019) (describing the General Counsel's burden in unilateral-change cases as that of "'establishing that the [employer] altered the status quo,'" (quoting *CPL (Linwood) LLC*, 367 NLRB No. 14, slip op. at 2 (2018)). Indeed, regardless of who produces the evidence of past practice and supporting policy, the General Counsel must grapple with that evidence in order to establish a violation of Section 8(a)(5) of the Act, as she unquestionably did here. ([ROA.1030-31](#), [1046-51](#).)

[10] In the underlying representation case, the Regional Director did not, as the Company implies (Br. 32), determine that the lake employees were in the bargaining unit. Rather, the Regional Director only permitted them to vote subject to challenge. Because none of the lake employees voted, their status as unit or non-unit employees was never decided. ([ROA.1083](#) n.6;[ROA.313](#).) In any event, as shown below, and as the Board explained, its finding that the lake employees'

different in kind and degree from the layoffs of Smith and Mendez (*see Raytheon*, 365 NLRB No. 161, slip op. at 13), because they were due to the distinctive extraordinary impact of the COVID-19 pandemic, not normal economic considerations. (ROA.1083-84.)

Specifically, the record shows that the three lake employees assisted the public in using the lake surrounding the plant for leisure boating and fishing activities, work that Luminant had approved the Company to perform for the entire year. (ROA.1084;ROA.113-14.) There is no serious dispute, as the Board found (ROA.1084), that the Company laid off the lake employees in the spring of 2020 due "to the unprecedented global pandemic" caused by COVID-19. (ROA.1084.) As Site Manager Crabtree acknowledged (ROA.114, 151, 153), the three layoffs occurred after Luminant canceled the lake work and closed the lake to the public. Consistent with Crabtree's acknowledgment, the Company specifically stated on the change-of-status forms for the three employees that their layoffs were "due to COVID-19." (ROA.1084;ROA.477, 479, 481.) And significantly, Crabtree further acknowledged that his superiors directed him to state that the layoffs were due to COVID-19 because at that time "there were many, many, many layoffs

layoffs were materially different from those at issue here made it unnecessary to determine the unit or non-unit status of the lake employees. (ROA.1083 n.6.)

36

going on across the United States due to Covid 19" and due to "the uncertainty of all of that."  (ROA.151-53.)

In sharp contrast to the layoff of the lake employees due to an unprecedented global pandemic and related shutdown of facilities, the evidence establishes that the Company laid off Smith and Mendez due to the ordinary ebb and flow of project work.  As Crabtree testified, Smith and Mendez performed project work rather than ongoing, everyday work like the lake employees. (ROA.1083;ROA.136.)  And it is undisputed that when Luminant decided to delay the air-compressor-replacement project to which Smith and Mendez were assigned, the Company laid them off due to the project delay alone.  Thus, as the Board correctly noted, the Company "has never claimed that these layoffs were due in any way to the pandemic."  (ROA.1083 n.8.)

In these circumstances, the Board reasonably found a difference of kind and degree between, on the one hand, the lake-employee layoffs due to a global pandemic that ended leisure activities for the general public and, on the other hand, layoffs due to a project delay.  As the Board explained, "the layoffs of the lake employees were different in kind from those of Smith and Mendez, as they were not due to the fluctuations in the [Company's] workload or any standard business and economic considerations but instead to the distinctive and unforeseeable effects of the COVID-19 pandemic."  (ROA.1084.)

37

Moreover, as the Board further explained, it has previously recognized that the pandemic presented "'extraordinary circumstances" and involved great "'uncertainties.'" (ROA.1084, *quoting Aspirus Keweenaw*, 370 NLRB No. 45, slip op. at 2, 3 (2020).)  Thus, the Board has, as here, reasonably "drawn a distinction between an employer's past practice of layoffs prior to the pandemic versus an employer's lack of any 'past practice relating to laying off employees in the face of an unprecedented pandemic.'" (ROA.1084, quoting *NP Texas LLC d/b/a Texas Station Gambling Hall and Hotel*, 370 NLRB No. 11, slip op. at 3 (2020).)[11]  And notably, "the broad health and safety concerns and enormous uncertainty associated with the lake employees' layoffs were not lost on the [Company], as it noted on their change-of-status forms that they were "'laid off due to COVID-19.'" (ROA.1084.)

In sum, the Board reasonably found that "because the circumstances of the lake employees' layoffs were unique and so materially different from the layoffs of Smith and Mendez . . . they do not indicate the existence of a past practice applicable to the circumstances here." (ROA.1084.)  Contrary to the Company's claim (Br. 35), the Board's finding is fully consistent with settled law concerning

---

[11] Contrary to the Company's contention (Br. 35-36), the Board's decisions in *Aspirus Keweenaw* and *NP Texas* are relevant because in both of those cases the Board recognized, as it did here, the uniqueness of the COVID-19 pandemic. Indeed, the Board's finding in *NP Texas*, that an employer had no past practice of laying off employees due to a pandemic, directly applies to its finding here.

asserted past practices. *See Adair Standish*, 912 F.2d at 863-64 (employer's argument that its postelection layoff policy was nothing more than a permissible continuation of the status quo "has no application" where the prior layoffs were "'unpredictably episodic,' as well as, 'ad hoc and highly discretionary'" (quoting *Local 512, Warehouse & Office Workers'*, 795 F.2d at 711-12); *Bemis Co.*, 370 NLRB No. 7, slip op. at 32-37 (employer acted unlawfully by unilaterally laying off employees where it did not establish a past practice of such layoffs); *Champion Home Builders Co.*, 350 NLRB 788, 791 (2007) (employer failed to meet its burden of establishing that it had a past practice of layoffs in response to work slowdowns); *Tri-Tech Servs. Inc.*, 340 NLRB 894, 894-95 (2003) (employer failed to establish a past practice of layoffs due to a decline in work where there were a limited number of prior layoffs and where the basis for how it chose employees for layoff varied).

Despite the Board's reasonable findings, the Company insists (Br. 31-34, 36-38), as it did before the Board, that it established a past practice because all of its layoffs may be generically characterized as owing to a lack of work from Luminant. But the Court, like the Board, should reject this invitation to paint with an excessively broad brush, and to empower unilateral action whenever a layoff can be attributed in some way to "lack of work"—a broad category that potentially covers nearly all layoffs.

As the Board explained, the Company's claim unreasonably "ignores the circumstances of the [Company's] layoffs of the three lake employees which were very specifically tied to the pandemic." (ROA.1084.) In essence, "[t]hrough its layoffs of the three lake employees, the [Company] has demonstrated its practice of laying off employees due to the unique circumstances of pandemic-related shutdowns." (ROA.1084.) By contrast, "there is no evidence that the layoffs [of Smith and Mendez] had anything to do with the pandemic." (ROA.1084.) "Instead," as the Board found, "they were due to a project delay." (ROA.1084.)

In recognizing these obvious distinctions between the layoffs, the Board did not, as the Company contends (Br. 22, 36-38), depart from its decisions in *Raytheon Network Centric Systems*, 365 NLRB No. 161 (2017), and *Mike-Sell's Potato Chip Co.*, 368 NLRB No. 145, slip op. at 3 (2019). In particular, contrary to the Company's suggestion (Br. 36), the Board in this case did not state that in order to establish a relevant past practice of layoffs, the employer would have to establish that it acted in each layoff for exactly the same reason. Rather, the Board, as in *Mike-Sell's*, merely concluded—after carefully examining all of the circumstances of the layoffs in evidence—that they were not similar in kind or indicative of "prolonged pattern of recurrent actions" (*Mike-Sell's*, 368 NLRB No. 145, slip op. at 4) that employees would reasonably recognize and expect.

In any event, the Company's effort to place its meager evidentiary showing on the same level as the employer showings in *Raytheon* and *Mike-Sell's* is misguided. In *Raytheon*, the evidence established that every January from 2001 to 2012 the employer made regular and frequent changes to employees' benefits and that the changes at issue in 2013 did not materially vary in kind or degree from prior changes. 365 NLRB No. 161, slip op. at 17-19. Similarly, in *Mike-Sell's*, the employer met its burden of establishing a past practice of unilaterally selling drivers' routes, by establishing that it had a history of selling routes over a prolonged period—51 times over 17 years. 365 NLRB No. 145, slip op. 3. Plainly, the sparse record of past layoffs in this case does not approach the evidentiary showing that warranted a finding of past practice in those cases.

Other than the lake employees' layoffs, the only other example of a layoff that the Company advances in support of its past-practice argument is its layoff of insulator journeyman Joe Ortiz. The Company laid off Ortiz in May 2020 due to a lack of work at the end of an outage period. Ortiz's change-of-status form contains only the code "D1," which Crabtree testified means laid off for lack of work, without any mention of COVID-19 as the basis. (ROA.1084;ROA.132-35, 152-53, 409.) However, as the Board reasonably found (ROA.1084) and the Company does not appear to seriously dispute (Br. 38), "a single layoff, by itself, cannot

41

demonstrate a past practice."[12]  *See, e.*g., *Bemis Co.*, 370 NLRB No. 7, slip op. at 1

fn. 3, 33-34 (single layoff 14 years earlier did not show a past practice); *Tri-Tech*

*Servs.*, 340 NLRB at 895 (past practice of layoffs not established by three

examples of prior layoffs in 8 years).  Accordingly, the Board reasonably

concluded that "this one example hardly shows a frequent and regular practice that

employees could reasonably expect to recur on a consistent basis."  (ROA.1084.)

### c.    Employment agreements and the Company's handbook do not establish a past practice

Having failed to establish a regular and frequent practice of similar layoffs,

the Company resorts to a claim (Br. 16-17, 24-31) that certain provisions in its

employment agreements and its handbook support finding a past practice.[13]  First,

it relies (Br. 26) on the portion of the following provision in both Smith's and

Mendez's employment agreements:

> I understand and fully agree that my employment with Day & Zimmermann
> is contingent upon successful completion of my background investigation
> and any training required.  I also understand that my employment is
> conditional upon client approval of qualifications and staffing needs.

(ROA.1084-85;ROA.108-09, 331, 334.)

---

[12] The Company contends (Br. 38) that Ortiz's layoff "confirms" its past practice,
but does not assert that his layoff, standing alone, can suffice to establish a past
practice.

[13] Given that the Board unequivocally addressed the Company's reliance on its
written documents (ROA.1083-84), the Company errs in claiming (Br. 16, 21, 24-
25, 31) that the Board focused only on actual past layoffs while ignoring the
"policies" set forth in the Company's written documents.

Second, the Company relies (Br. 26) on the portion of its employee handbook stating:

> Due to the nature of its business, employees are the Company's most valuable asset. All non-staff, craft positions are temporary, varying in length according to contract duration.

(ROA.1085;ROA.109-10, 340, 391, 393.)

As the Board reasonably found (ROA.1085), the handbook and contractual provisions to which the Company refers do not even remotely establish a past practice that "all employees are subject to layoffs at any time depending on the staffing needs of [the Company's] client." As the Board explained, "[t]he relevant language in the employment agreements refers to the employee's successful completion of a background investigation, training, and client approval of their qualifications, all of which speak to initial requirements for employment"—not layoffs or termination of employment. (ROA.1085.) Accordingly, "[i]t is, at best, unclear whether the reference to 'staffing needs' in this context is intended to describe circumstances beyond the initial period." (ROA.1085.) And with regard to the handbook, the Board similarly explained that "the referenced provision in the [Company's] handbook simply describes employment as temporary and based on contract duration; it does not mention staffing needs or layoffs." (ROA.1085.)

Given that "these provisions are ambiguous about and do not describe with any specificity the circumstances of layoffs" (ROA.1085), the Board was fully

43

warranted in finding (ROA.1085) that they fall short of "demonstrat[ing] the existence of an established past practice applicable to the layoffs at issue here." *See, e.g., Gannett Rochester Newspapers*, 319 NLRB 215, 215 n.1, 220–21 (1995) (finding ambiguous policy insufficient to prove established past practice) (citing *Ithaca Journal-News, Inc.*, 259 NLRB 394, 396 (1981)).[14]

## 2. The Company's remaining contentions are without merit

Having failed to establish a prior practice of layoffs based on actual layoffs or written policies, the Company is in no position to assert a past practice of layoffs based on Site Manager Crabtree's general testimony (Br. 25, 27-30, 39-40, ROA.120-21) that layoffs due to a lack of work were an inherent aspect of the Company's business. In any event, Crabtree did not offer any testimony that he was ever laid off during the term of a contract due to a project delay—the type of layoff at issue here—but instead only claimed (ROA.122) that, under a very different circumstance, the Company had once laid him off after it lost a contract with a client. Thus, his testimony does not constitute specific evidence supportive of the Company's past-practice claims. More broadly, given the overall dearth of

---

[14] Although the Company heavily relies (Br. 27-30) on *800 River Road Operating Co., LLC d/b/a Care One at New Milford*, 369 NLRB No. 109 (2020), as support for its contentions regarding its handbook and contractual policies, there is no comparison between the definite disciplinary policy that empowered unilateral discipline in that case and the vague policies that do not directly speak to the issue of layoffs here.

evidence with regard to the Company's layoff policies and practices, there is no basis for the Company's claim (Br. 39) that employees would necessarily recognize layoffs as part of a familiar pattern comporting with the Company's usual practice.

Finally, the Company's claim (Br. 28-29) that under the Board's reasoning it could have neither retained nor laid off Smith and Mendez without acting unlawfully is specious. The Board is not precluding the Company from making needed changes, nor did it determine that Smith and Mendez or any other employees would have necessarily kept their jobs had the Union received timely notice and an opportunity to bargain. Rather, the Board's decision simply applies the well-established principle that the layoff of unit employees is a mandatory subject of bargaining. Such bargaining could have conceivably avoided layoffs— for example, if the parties had agreed to reduce employee work hours instead of laying off employees—or it could have clarified the order of layoffs and identified regular procedures. In arguing for the right to lay off employees without any consultation with the Union, in other words, the Company neglects the potentially wholesome effects of bargaining on its decisions with regard to the bargaining-unit employees.

* * *

In sum, the Board reasonably found that whether "considered separately or together" the Company's asserted past-practice evidence—"consisting of the materially different layoffs of the three lake employees, a single employee's layoff, and the ambiguous language of certain employment policies"—fell "far short of establishing that the layoffs of Smith and Mendez were in accordance with an established past practice." (ROA.1085.) Accordingly, the Board was fully warranted in concluding that the Company violated Section 8(a)(5) and (1) of the Act "by laying off unit employees Smith and Mendez without providing the Union prior notice and an opportunity to bargain." (ROA.1085-86.)

## CONCLUSION

For the foregoing reasons, the Board respectfully requests that the Court deny the Company's petition for review, grant the Board's cross-application for enforcement, and enter a judgment enforcing the Board's Order in full.

Respectfully submitted,

/s/Milakshmi V. Rajapakse
Milakshmi V. Rajapakse
    *Supervisory Attorney*

/s/David A. Seid
David A. Seid
    *Attorney*

National Labor Relations Board
1015 Half St. SE
Washington, DC 20570
(202) 273-4231
(202) 273-2941

JENNIFER A. ABRUZZO
*General Counsel*

PETER SUNG OHR
*Deputy General Counsel*

RUTH E. BURDICK
*Deputy Associate General Counsel*

DAVID HABENSTREIT
*Assistant General Counsel*

National Labor Relations Board

February 2023

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

| | |
|---|---|
| THE ATLANTIC GROUP INCORPORATED | ) |
| | ) No. 22-60442 |
| Petitioner/Cross-Respondent | ) |
| | ) Board Case No. |
| v. | ) 16-CA-260413 |
| | ) |
| NATIONAL LABOR RELATIONS BOARD | ) |
| | ) |
| Respondent/Cross-Petitioner | ) |

**CERTIFICATE OF SERVICE**

I hereby certify that on February 3, 2023, I electronically filed the foregoing

document with the Clerk of the Court for the United States Court of Appeals for

the Fifth Circuit by using the CM/ECF system.  I certify further that the foregoing

document was served on all parties or their counsel of record through the appellate

CM/ECF system.

/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, SE
Washington, DC  20570
(202) 273-2960

Dated at Washington, DC
this 3rd day of February 2023

# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

THE ATLANTIC GROUP INCORPORATED    )
    ) No. 22-60442
      Petitioner/Cross-Respondent   )
    ) Board Case No.
      v.   ) 16-CA-260413
    )
NATIONAL LABOR RELATIONS BOARD   )
    )
      Respondent/Cross-Petitioner   )

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the Board certifies that its motion contains 11,353 words of proportionally spaced, 14-point type, and the word-processing system used was Microsoft Word for Office 365.

/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, SE
Washington, DC 20570
(202) 273-2960

Dated at Washington, DC
this 3rd day of February 2023