No. 22-60442

# In the United States Court of Appeals for the Fifth Circuit

---

THE ATLANTIC GROUP, INCORPORATED,

*Petitioner – Cross-Respondent,*

v.

NATIONAL LABOR RELATIONS BOARD,

*Respondent – Cross-Petitioner.*

---

On Petition for Review of an Order
of the National Labor Relations Board,
(NLRB Case Nos. 16-CA-260413, 16-CA-260262, 16-CA-260499,
16-CA-263091, and 16-CA-263222)

---

## REPLY BRIEF OF PETITIONER/CROSS-RESPONDENT THE ATLANTIC GROUP, INC.

---

John V. Jansonius
David R. Schlottman
JACKSON WALKER LLP
2323 Ross Avenue, Ste. 600
Dallas, Texas  75201
(214) 953-6000

Michael A. Drab
JACKSON WALKER LLP
1401 McKinney St., Ste. 1900
Houston, TX 77010
(713) 752-4446

*Attorneys for Petitioner/Cross-Respondent*

## TABLE OF CONTENTS

**Page(s)**

INTRODUCTION .................................................................................1

ARGUMENT .......................................................................................2

I.   The Company Did Not Make A Unilateral Change By Laying Off
     Smith And Mendez For Lack Of Work. ......................................2

     A.   The General Counsel offered no evidence of the status quo
          before the alleged change. ................................................2

     B.   Existing terms and conditions of employment are the
          status quo when a union first arrives. ................................3

     C.   Separately from policy, the Company established a past
          practice. ...........................................................................7

II.  The Atlantic Group Did Not Threaten Or Intimidate Employees. ................13

     A.   The Board's finding rests on assumption and bias, not on
          evidence and objectivity. ................................................13

     B.   Section 8(c) protects the opinions in the transcript. ...........16

          1.   The General Counsel must have the burden of
               proof. ......................................................................16

          2.   The alleged statements are based on objectively
               verifiable facts. .......................................................19

          3.   Bales did not threaten any reprisal by The Atlantic
               Group. .....................................................................20

III. The Board Cannot Require Employers To Violate The NLRA In
     Order To Exercise Administrative Rights Of Review..................23

CONCLUSION ..................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*800 River Rd. Operating Co., LLC,*
369 NLRB No. 109 (2020) ..........................................................4, 5, 6

*AFL-CIO v. NLRB,*
No. 20-5223 (D.C. Cir. Jan. 17, 2023) .......................................25, 26

*Allentown Mack Sales & Serv., Inc. v. NLRB,*
522 U.S. 359 (1998)..............................................................................8

*Audio Visual Servs. Grp., Inc.,*
365 NLRB No. 84 (2017) ...............................................................24, 25

*Brown & Root, Inc. v. NLRB,*
333 F.3d 628 (5th Cir. 2003) .......................................................15, 16

*Carey Salt Co. v. NLRB,*
736 F.3d 405 (5th Cir. 2013) .............................................................9

*Chamber of Commerce v. Brown,*
554 U.S. 60 (2008).......................................................................17, 18

*Chevron Oil Co. v. NLRB,*
442 F.2d 1067 (5th Cir. 1971) ..........................................................18

*Chrysler Credit Corp. v. J. Truett Payne Co.,*
670 F.2d 575 (5th Cir. 1982) .......................................................14, 15

*CPL (Linwood) LLC,*
367 NLRB No. 14 (2018) ................................................................2, 3

*DISH Network Corp. v. NLRB,*
953 F.3d 370 (5th Cir. 2020) ........................................................3, 14

*El Paso Elec. Co. v. NLRB.*,
    681 F.3d 651 (5th Cir. 2012) ...............................................................19

*Hogan Transports, Inc.*,
    363 NLRB 1980 (2016) ...............................................20, 21, 22, 23

*Letter Carriers v. Austin*,
    418 U.S. 264 (1974) ...............................................................................18

*Linn v. Plant Guard Workers*,
    383 U.S. 53 (1966)...................................................................................18

*Mike-Sell's Potato Chip Co.*,
    368 NLRB No. 145 (2019) .......................................................10, 11, 12

*NLRB v. Arkema, Inc.*,
    710 F.3d 308 (5th Cir. 2013) ...............................................................16

*NLRB v. Gissel Packing Co.*,
    395 U.S. 575 (1969)...........................................................................*passim*

*NLRB v. Pentre Elec., Inc.*,
    998 F.2d 363 (6th Cir. 1993) ...............................................................19

*NLRB v Truitt Mfg. Co.*,
    351 U.S. 149 (1956)................................................................................26

*NLRB v. Va. Elec. & Power Co.*,
    314 U.S. 469 (1941)................................................................................17

*NLRB v. Westinghouse Broad. & Cable, Inc.*,
    849 F.2d 15 (1st Cir. 1988) ...................................................................27

*NP Palace, LLC*,
    368 NLRB No. 148 (2019) .............................................................25, 26

*PG Publ'g Co.*,
    368 NLRB No. 41 (2019) .................................................................2, 3

*Raven Servs. Corp. v. NLRB*,
   315 F.3d 499 (5th Cir. 2002) ....................................................5

*Raytheon Network Centric Sys.*,
   365 NLRB No. 161 (2017) .......................................................11

*Sabine Towing & Transp. Co. v. NLRB*,
   599 F.2d 663 (5th Cir. 1979) ...................................................19

*Technicolor Gov't Servs., Inc. v. NLRB*,
   739 F.2d 323 (8th Cir. 1984) ...................................................24

*Tellepsen Pipeline Servs. Co. v. NLRB*,
   320 F.3d 554 (5th Cir. 2003) ...................................................20

*Tex. Indus., Inc. v. NLRB*,
   336 F.2d 128 (5th Cir. 1964) ...................................................20

*Thomas v. Collins*,
   323 U.S. 516 (1945)................................................................17

*UXB International*,
   321 NLRB 446 (1996) ..............................................20, 21, 22, 23

*Westinghouse Elec. Corp. (Mansfield Plant)*,
   150 NLRB 1574 (1965) ............................................................10

## Statutes

29 U.S.C. § 153(b) ........................................................................24

29 U.S.C. § 158(a)(1)....................................................................15

29 U.S.C. § 158(c) ..................................................................16, 17

## Other Authorities

Representation Case Procedures, 84 Fed. Reg. 69,254 (Dec. 19, 2019) .....24, 25, 26

First Amendment to the United States Constitution ......................................1, 17, 18

## INTRODUCTION

The General Counsel fails to persuasively defend the Board's findings. Uncontested evidence proves The Atlantic Group acted consistently with the pre-union status quo, and also with established practice after union representation began, when it laid off Smith and Mendez for lack of work. The ALJ correctly found a past practice, and the Board was wrong.

Regarding the section 8(a)(1) charge, the recorded transcript offered at trial lacks any context. The Board could not properly find unlawful threats under a totality of the circumstances. Further, the Board inappropriately required the Company to prove that section 8(c) of the Act and the First Amendment do not protect the statements at issue.

On the refusal to bargain charge, the NLRA does not support the Board's position. The Board's current policy is that an employer must commit an unlawful refusal to bargain as a condition to exercising a statutory right to review a certification decision. The Board's arguments on appeal and its published comments demonstrate that this policy is unworthy of deference.

1

# ARGUMENT

## I.    The Company Did Not Make A Unilateral Change By Laying Off Smith And Mendez For Lack Of Work.

### A.    The General Counsel offered no evidence of the status quo before the alleged change.

The General Counsel concedes that she "has the burden of proof of proving the alleged unfair labor practice." Resp't Br. at 35 n.9.  Here, that means she had to prove the status quo as to layoffs prior to the alleged change.  *See CPL (Linwood) LLC*, 367 NLRB No. 14, slip op. at 2 (2018) (employer's denial of a schedule change request was not a unilateral change where the General Counsel failed to prove the employer had always granted similar requests in the past); *see also PG Publ'g Co.*, 368 NLRB No. 41, slip op. at 4 (2019).  Necessarily, to establish that the Company made a unilateral change when it laid off Smith and Mendez for lack of work, the General Counsel had to prove that employees had an expectation based on contract or company policy that their employment at Comanche Peak would continue even if there was no work for them.

There is no evidence in the record of such a policy, contract, or expectation at any point in time. The General Counsel did not call Smith, Mendez, any employee, or any manager to testify that layoff for lack of work would be a deviation from standard terms and conditions.  The reason is obvious.  The Atlantic Group is a contractor providing staffing support to a single client.  Given that context—and the

2

unambiguous and uncontroverted policies and evidence discussed below—every employee knew that she was subject to layoff if there was no work.

The Board simply assumed that the layoff of Smith and Mendez for lack of work was a deviation from the pre-union status quo. Assumptions are not "substantial evidence." As this Court observed in *DISH Network Corp. v. NLRB*: "Suspicion, conjecture, and theoretical speculation register no weight on the substantial evidence scale." 953 F.3d 370, 378 (5th Cir. 2020).

The General Counsel asserts that the Company must prove a past practice. Resp't Br. at 35 n.9. This position conflates separate concepts. As the General Counsel acknowledges, past practice is a *defense* when a change to prior terms and conditions has been established. Resp't Br. at 24. However, the General Counsel must always first prove: (1) the status quo; and (2) a change from that status quo. *See CPL (Linwood) LLC*, 367 NLRB No. 14, slip op. at 2. To hold otherwise would flip the burden of proof and place employers in the untenable position of disproving a change. The Board previously reversed an ALJ for doing exactly that. *PG Publ'g Co.*, 368 NLRB No. 41, slip op. at 4.

> **B.     Existing terms and conditions of employment are the status quo when a union first arrives.**

The Board erred by not recognizing that the status quo may be established solely by policies that existed at the time of union certification. The preexisting policies here are (1) hiring agreements with every employee that state, "I also

understand that my employment is conditional upon client approval of qualifications and staffing needs,"  ROA.331, 334, and (2) an Employee Handbook confirming that "[a]ll non-staff, craft positions are temporary, varying in length according to contract duration," ROA.339-41.

The Board considered only whether there was a past practice.  ROA.1085 ("Contrary to the Respondent's contentions, we find these two provisions do not establish the asserted past practice.").  The General Counsel's briefing reiterates that mistake.  Resp't Br. 42-44.  This position ignores direct Board precedent holding that policies alone—irrespective of past practice—establish the status quo.  *See 800 River Rd. Operating Co., LLC*, 369 NLRB No. 109, slip. op., at 1 (2020).

The employer in *800 River Rd.* had a policy before union certification that if an employee's conduct was "unsatisfactory," the employer could assess "[a]ny of the disciplinary actions described below, including termination, . . . depending on the nature of the specific inappropriate behavior, conduct, or performance and other relevant factors."  369 NLRB No. 109, slip. op., at 2.  After union certification, but before the first collective bargaining agreement—the situation here—four employees violated the policy.  *Id.*  Three were suspended and the other was fired.  *Id.*

The Board found no unilateral change because the disciplinary policy before union certification was the status quo.  That policy allowed for discretionary

discipline. So, after the union's arrival, the employer's discretionary decision to discipline and terminate employees under that policy was not a change. *See id.* at 7-8 ("The [employer] applied its preexisting disciplinary policy, which included the use of discretion, in disciplining the four employees, which it is lawfully permitted to do.").

The Board in *800 River Rd.* did not consider whether the employer had disciplined or discharged employees for similar conduct in the past. Past practice did not matter. What matters when there is a new union and no collective bargaining agreement is that the employer had a preexisting policy allowing it to make discretionary discipline and discharge decisions. Here, the Board committed reversible error and applied an incorrect legal standard by failing to consider that the hiring agreements and employee handbook established the status quo irrespective of past practice. *See Raven Servs. Corp. v. NLRB*, 315 F.3d 499, 504 n.8 (5th Cir. 2002) ("Where the NLRB applies an incorrect legal standard, however, we cannot enforce its order.").

The Board and the General Counsel each attempt to distinguish *800 River Rd.,* but for different reasons. Neither is persuasive. The Board claims that *800 River Rd.* is insignificant because "the Respondent's conduct does not involve the imposition of discipline, but rather a layoff of employees, in the absence of an established disciplinary policy or practice." ROA.1085. That is a distinction without a

difference. *800 River Rd.* is not limited to discipline cases and, instead, stands for the broader point that "in order to maintain the status quo, an employer must continue to make decisions materially consistent with its established policy *or* practice, including its use of discretion, after the certification or recognition of a union." *See 800 River Rd.*, 369 NLRB No. 109, slip. op., at 5-6 (emphasis added).

The General Counsel takes a different route. Rather than trying to narrow the holding in *800 River Rd.*, she argues in a footnote that "there is no comparison between the definite disciplinary policy that empowered unilateral discipline in that case and the vague policies that do not directly speak to the issue of layoffs here." Resp't Br. 44. That statement is condescending to employees and cannot be squared with uncontroverted evidence.

In *800 River Rd.*, the disciplinary policy permitted the employer to do as it pleased, up to and including termination, if an employee engaged in "unsatisfactory" conduct. 369 NLRB No. 109, slip. op., at 2. That is hardly a statement of clarity. The Atlantic Group policies, by contrast, clearly establish that an employee is subject to layoff for lack of work. ROA.331, 334 ("I also understand that my employment is conditional upon . . . staffing needs."); ROA.339–41 ("All non-staff, craft positions are temporary, varying in length according to contract duration.").

*800 River Rd.* cannot be distinguished. It is directly on point. If it is not a unilateral change for an employer to discretionarily fire an employee under a general

disciplinary policy, then it was not a unilateral change for The Atlantic Group to layoff Smith and Mendez consistent with the terms of the hiring agreements and handbook policies in place prior to the Union's certification. Notably, the General Counsel did not call a single employee to testify about anything. If there was confusion in the ranks about the possibility of layoff for lack of work, the General Counsel could have presented such evidence.

### C.    Separately from policy, the Company established a past practice.

The Board also erred in rejecting the ALJ's finding that the Company proved a past practice of laying off employees for lack of work. The Board's errors, which the General Counsel fails to persuasively defend, are twofold. Dissenting Member Kaplan succinctly critiqued the errors in his colleagues' reasoning. ROA.1087-88.

*First*, the Board's interpretation of the trial evidence is indefensible. According to the Board, the Company's layoff of the lake workers was "very specifically tied to the pandemic." ROA.1084. The only evidence cited by the Board is that the termination paperwork for the lake workers noted, "Layed off due to COVID-19." ROA.477, 479, 481, 1084. Additionally, the General Counsel notes testimony from Site Manager Crabtree that he was instructed to notate COVID-19 on the termination paperwork. Resp't Br. 36; ROA.151.

Both the Board and the General Counsel cherry-picked incomplete trial evidence to reach their preferred outcome. Along with "COVID-19," the

termination paperwork lists a termination code of "D-1." ROA.477, 479, 481. "D-1" means lack of work. ROA.115. The Board separately credited this fact in its decision. ROA.1084. In a concession by omission, the General Counsel's briefing failed to address this fact.

Under the flawed and manipulated reasoning of the Board and the General Counsel, the fact that termination paperwork notes "layed off due to COVID-19" leads to a conclusive inference the layoffs were "very specifically tied to the pandemic," ROA.1084. Yet the fact the same paperwork also notes "D-1" (laid off for lack of work) is meaningless. This glaringly selective reading of the trial evidence cannot survive substantial evidence review. *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 378 (1998) ("[The Board] is not free to prescribe what inferences from the evidence it will accept and reject . . . ."). Again, the ALJ and dissenting Member Kaplan both found the layoffs of the lake workers and Ortiz established a past practice of laying off employees for lack of work.[1]

---

[1] The Board has been unprincipled when analyzing the impact of COVID-19 on bargaining obligations, alternatively downplaying and emphasizing the pandemic to suit its desired outcome. It recently held that COVID-19 did not excuse bargaining regarding non-essential workers laid off because the government shutdown non-essential services. *McLaren Macomb*, 372 NLRB No. 58, slip op. at 2 n.8 (2023). Yet, here, COVID-19 presented "extraordinary circumstances" that effectively created bargaining obligations. ROA.1084.

The General Counsel's spin on Crabtree's testimony is similarly distorted. The General Counsel claims "Crabtree further acknowledged that his superiors directed him to state that the layoffs were due to COVID-19 because at that time 'there were many, many, many layoffs going on across the United States due to Covid-19' and 'due to the uncertainty of all of that.'" Resp't Br. 36-37. The General Counsel omits the context of that testimony.

Crabtree testified he wrote COVID-19 on the termination paperwork so that affected workers could more quickly collect unemployment compensation. ROA.150-151. The General Counsel also conspicuously omits that, earlier in his testimony, Crabtree unequivocally testified that the lake workers were laid off "due to lack of work." ROA.114. The General Counsel's out-of-context twisting of Crabtree's trial testimony cannot support a finding that the lake workers were terminated for different reasons than Smith and Mendez. *See Carey Salt Co. v. NLRB*, 736 F.3d 405, 410 (5th Cir. 2013) (noting that a fact finding cannot survive review if it "ignores a portion of the record" or fails to "take into account whatever in the record fairly detracts from its weight").

*Second*, in concluding that the layoff of the lake workers was materially different than the layoff of Smith and Mendez, the Board applied an unduly restrictive standard of "similarity," again clashing with its own precedent. As noted in The Atlantic Group's opening brief, under current board precedent, "[t]o establish

9

the existence of a past practice, it is enough to show that frequent, recurrent, and similar *actions* have been taken, for whatever reasons, such that employees would recognize an additional action as part of 'a familiar pattern comporting with the [r]espondent's usual method of conducting its manufacturing operations.'" *Mike-Sell's Potato Chip Co.*, 368 NLRB No. 145, slip op. at 4 (2019) (quoting *Westinghouse Elec. Corp. (Mansfield Plant)*, 150 NLRB 1574, 1576 (1965)).

The General Counsel argues that "the Board in this case did not state that to establish a relevant past practice of layoffs, the employer would have to establish that it acted in each layoff for exactly the same reason." Resp't Br. 40. Nonetheless, the effect of the Board's finding is precisely that. As discussed above, Crabtree testified without contradiction that both the lake workers and Smith and Mendez were laid off for lack of work. ROA.114, 136. Further, the termination paperwork for the lake workers lists "D-1" (lack of work). ROA. 477, 479, 481.

The Board could only find these layoffs to be "materially different" if it assessed similarity through the lens of exact equivalence—which Board precedent rejects. *Mike-Sell's*, 368 NLRB No. 145, slip op. at 4. Exact equivalence will rarely if ever exist when comparing one employment situation to another. The Board's insistence of such here further shows its desire to prohibit newly unionized employers from taking any significant employment actions before reaching terms of a collective bargaining agreement with a nascent union.

10

The General Counsel also incorrectly contends that "the Company's effort to place its meager evidentiary showing on the same level as the employer showings in *Raytheon* and *Mike-Sell's* is misguided." Resp't Br. 41. In *Raytheon*, a change that occurred once a year for 12 years was frequent enough to establish a past practice. *Raytheon Network Centric Sys.*, 365 NLRB No. 161, slip op. at 17-19 (2017). In *Mike-Sell's*, a change that took place 51 times over 17 years (an average of 3 times per year) was enough. *Mike-Sell's*, 368 NLRB No. 145, slip op. at 3. Thus, *Raytheon* and *Mike-Sell's* hold that a change occurring anywhere from one to three times per year could be sufficient to establish past practice.

Here, the Atlantic Group began work at Comanche Peak on January 30, 2020. ROA.105. By April 28, 2020, the Company had already laid off the three lake workers and Joe Ortiz for lack of work. ROA.113-14, 132-35, 409-10, 477, 479, 481. Smith and Mendez were then laid off for the same reason in mid-July 2020. ROA.136-37. Thus, within three months of commencing work at Comanche Peak, the Company laid off approximately 6.5% of voting-eligible employees. Adding Smith and Mendez, that figure jumped to approximately 10% before month six. Considering a less-than-six-month history, the frequency of layoffs here far exceeds the frequency of changes the Board found sufficient to establish a past practice in *Raytheon* and *Mike-Sell's*.[2]

---

[2] The cases cited by the General Counsel on page 39 of her Brief involve inapposite

Ultimately, neither the Board nor the General Counsel have cited any evidence, let alone substantial evidence, to disturb the ALJ's finding that "[The Atlantic Group] had a past practice of laying off employees . . . due to lack of work." ROA.1096.   Consistent with that finding, dissenting Member Kaplan correctly observed "the layoffs of Smith and Mendez were 'similar in kind and degree' to the Respondent's past layoffs and consistent with its established policy and practice." ROA.1087.

To establish a past practice, "it is enough to show that frequent, recurrent, and similar *actions* have been taken, for whatever reasons, such that employees would recognize an additional action as part of a familiar pattern comporting with the [r]espondent's usual method of conducting its . . . operations."   *Mike-Sell's*, 368 NLRB No. 145, slip op. at 4 (2019) (cleaned up).   Given the hiring agreements, the handbook policies, the layoffs of the lake workers and Ortiz for lack of work, and the fundamental fact that The Atlantic Group is a maintenance contractor to a single client, employees clearly would recognize the layoffs of Smith and Mendez for lack of work as consistent with its usual method of operation.   That is a past practice.   *See id.*   The Board majority's finding to the contrary is not supported by substantial evidence and the Court should deny enforcement.

---

situations where there was no past practice because the actions at issue were far less frequent and consistent than the layoffs here.

12

## II.     The Atlantic Group Did Not Threaten Or Intimidate Employees.

### A.     The Board's finding rests on assumption and bias, not on evidence and objectivity.

All agree the General Counsel has the burden of proof.  In the "fact" section of her Brief, the General Counsel restates the Board's finding that: "At some point between the issuance of the Decision and Direction of Election on March 18 and the mailing of the ballots to employees on April 20, Jerry Bales, the site superintendent who oversaw all of the Company's operations at the plant, addressed a group of bargaining-unit employees at an on-site meeting."  Resp't Br. at 5.  This assertion is not supported by record evidence in four respects.[3]

*First*, there is not substantial evidence that Jerry Bales was the speaker.  The sole evidence the General Counsel cites to support the Board's finding is two instances in which the speaker states, "this is not from the Company; this is from Jerry Bales."  ROA.319, 321.  While these statements might reflect that Bales was speaking, it is also plausible the speaker was a third party conveying the opinions of Bales, someone role playing in preparation for fighting the Company's resistance of union organization, or even someone impersonating Bales for nefarious reasons.  However, it is not The Atlantic Group's burden to prove which is true.

---

[3] Elevating Bales to overseeing "all of the Company's operations at the plant" is a bewildering misrepresentation.  There is no such evidence in the record.

Instead, as a federal prosecutor with the burden of proof, it was the General Counsel's obligation to introduce actual evidence, not surmise, tipping the scale in one direction or the other. Based on the record the General Counsel developed at trial, it is a guess that Bales was speaking. Again, however, "[t]he burden of putting forth substantial evidence is not satisfied by mere speculation and guess work." *Chrysler Credit Corp. v. J. Truett Payne Co.*, 670 F.2d 575, 582 (5th Cir. 1982).

*Second*, there is not substantial evidence proving specifically when the statements were made. The speaker notes that he wants "to talk to you a little about the union", ROA.319, that "everybody now has had a chance to go through all of the sessions," *id.*, and also encourages whatever audience might be there to vote, ROA.324. Again, these words might identify a timeframe, but it is likewise plausible the statements were made at some other time. The General Counsel cannot sidestep her failure to present meaningful evidence by faulting The Atlantic Group for not proving an alternate explanation. Resp't Br. 19 ("In any event, the Company tellingly does not say what further context is necessary, or how it might have affected the analysis of Bales' threats."). Much to the contrary, the General Counsel bears the burden of proof, yet the case she presented at trial creates only a possibility of timing. That is not substantial evidence. *DISH Network Corp.*, 953 F.3d at 378.

14

*Third*, the Board and General Counsel place the statements "at an on-site meeting." Resp't Br. 5; ROA.1082,  Once again, there is no such evidence. The speaker in the transcription at no point identifies his location. *See* ROA.319-28.

*Fourth*, no evidence supports the Board's finding that the speaker "addressed a group of bargaining-unit employees." Resp't Br. 5; ROA.1082. Under the NLRA, employers cannot "interfere with, restrain, or coerce *employees*." 29 U.S.C. § 158(a)(1). To establish this violation, the General Counsel had to prove that "employees" as defined in section 2(3) of the Act were present. *See id.* However, the General Counsel offered no evidence of who was present nor that they were section 2(3) employees. One might guess that bargaining unit employees were present, but again, "mere speculation and guess work" are not substantial evidence. *Chrysler*, 670 F.2d at 582.

Alleged threats "must be assessed within the totality of the circumstances surrounding the occurrence at issue." *Brown & Root, Inc. v. NLRB*, 333 F.3d 628, 634 (5th Cir. 2003). Here, the grand total of the evidence offered is a transcript and recording that allow a guess—but nothing more than a guess—that Jerry Bales made statements to bargaining unit employees sometime during an election campaign. The General Counsel could have developed the record and proved her case in any number of ways, assuming there was supporting evidence. The General Counsel

15

could have called Jerry Bales or any bargaining unit employee present at the meeting to testify. She chose not to. The record is barren.

Because there are no facts from which to assess "the totality of the circumstances surrounding the occurrence at issue," *Brown & Root,*, 333 F.3d at 634, there is no basis "to conscientiously conclude that the evidence supporting the Board's determination is substantial," *NLRB v. Arkema, Inc.*, 710 F.3d 308, 314-15 (5th Cir. 2013). The Court should deny enforcement of the Board's finding.

### B.    Section 8(c) protects the opinions in the transcript.

Section 8(c) of the NLRA provides: "The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). The General Counsel has not identified substantial evidence supporting the Board's conclusion that section 8(c) is inapplicable to the statements attributed to Jerry Bales.[4]

### 1.    *The General Counsel must have the burden of proof.*

Section 8(c) of the NLRA originated from Congressional and Supreme Court disapproval of the Board's repeated disregard of employer free speech rights.

---

[4] For simplicity, Petitioner will again assume (despite lack of evidence) that Bales was the speaker.

Fundamentally, section 8(c) is a rebuke of Board overreach.  The history of section 8(c) is instructive.

After passage of the NLRA in 1935 (then commonly known as the Wagner Act), the Board initially "took the position that section 8 demanded complete employer neutrality during organizing campaigns, reasoning that any partisan employer speech about unions would interfere with the § 7 rights of employees." *Chamber of Commerce v. Brown*, 554 U.S. 60, 66 (2008).  In 1941, the United States Supreme Court, concerned with the "NLRB's aggressive interpretation," *id.*, held that nothing in the NLRA prohibits an employer "from expressing its view on labor policies or problems" unless the employer's speech "in connection with other circumstances [amounts] to coercion within the meaning of the Act."  *NLRB v. Va. Elec. & Power Co.*, 314 U.S. 469, 477 (1941).  *Virginia Electric* recognizes the First Amendment right of employers to engage in non-coercive speech about unionization.  *See Thomas v. Collins*, 323 U.S. 516, 537-538 (1945).

Notwithstanding the Supreme Court's admonition, "the NLRB continued to regulate employer speech too restrictively in the eyes of Congress."  *Brown*, 554 U.S. 60 at 67.  "Concerned that the Wagner Act had pushed the labor relations balance too far in favor of unions, Congress passed the Labor Management Relations Act, 1947 (Taft-Hartley Act)."  *Id.*  The Taft-Hartley Act amended the NLRA to add section 8(c).  *Id.*; *see* 29 U.S.C. § 158(c).

17

The Supreme Court has observed that section 8(c) not only "implements the First Amendment," *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969), but also "manifested a congressional intent to encourage free debate on issues dividing labor and management," *Brown*, 554 U.S. at 67 (quoting *Linn v. Plant Guard Workers*, 383 U.S. 53, 62 (1966)).  As emphasized by the Supreme Court, the scope of that Congressional intent is broad:

> It is indicative of how important Congress deemed such "free debate" that Congress amended the NLRA rather than leaving to the courts the task of correcting the NLRB's decisions on a case-by-case basis. We have characterized this policy judgment, which suffuses the NLRA as a whole, as "favoring uninhibited, robust, and wide-open debate in labor disputes," stressing that "freewheeling use of the written and spoken word . . . has been expressly fostered by Congress and approved by the NLRB."

*Id.* (quoting *Letter Carriers v. Austin*, 418 U.S. 264, 272-273 (1974)).

Given the history and purpose of section 8(c), the General Counsel must bear the burden to prove that an employer's comments about unionization are *not* protected under section 8(c) or the First Amendment.  That conclusion flows naturally from this Court's prior holding that "the burden of proving unlawful conduct is borne by the General Counsel for the Board." *Chevron Oil Co. v. NLRB*, 442 F.2d 1067, 1069 (5th Cir. 1971).  This conclusion is also consistent with well-

reasoned out-of-circuit precedent. *See NLRB v. Pentre Elec., Inc.*, 998 F.2d 363, 371 (6th Cir. 1993).

The Board's decision improperly placed on the Company "the burden of proving that [a] prediction is based on objective fact." ROA.1082. This legal conclusion, which is subject to *de novo* review, *El Paso Elec. Co. v. NLRB.*, 681 F.3d 651, 656 (5th Cir. 2012), is plainly erroneous. The Court should decline to enforce the Board's order for this reason alone. *Sabine Towing & Transp. Co. v. NLRB*, 599 F.2d 663 (5th Cir. 1979) (declining to enforce Board order where the Board misallocated the burden of proof). Constitutional rights are not to be conveniently limited. A federal agency seeking to restrain or punish speech must bear the burden of proving a justifiable reason.

### 2.     *The alleged statements are based on objectively verifiable facts.*

Even if The Atlantic Group held the burden to prove that Bales's statements were based on objectively verifiable facts, the Company satisfied that burden based on the content of the transcript.

The General Counsel contends "[t]here is no evidence that Luminant ever told the Company that it would, or even could, cancel its contract if the Company's employee unionized." Resp't Br. 22. That is false. Bales stated that "the client [Luminant] wants this group to remain non-union" and "I have heard it from Luminant executives in the past." ROA.322.

This Court's precedent simply requires that a statement be "capable of proof based on objective fact." *Tellepsen Pipeline Servs. Co. v. NLRB*, 320 F.3d 554, 563 (5th Cir. 2003) (emphasis added). The statements attributed to Bales meet this standard. The implication of the Board's position is that an employer must provide a dissertation of a prediction's basis, but that requirement is not within the text of section 8(c) or cases applying it.

### 3.    *Bales did not threaten any reprisal by The Atlantic Group.*

To establish a section 8(a)(1) violation, the General Counsel had to prove a threat of economic reprisal by The Atlantic Group itself. *Tex. Indus., Inc. v. NLRB*, 336 F.2d 128, 130 (5th Cir. 1964) ("It is only when the employer . . . threatens to himself take economic or other reprisals against the employees that a § 8(a)(1) violation may be found."); *see also Gissel Packing Co.*, 395 U.S. at 619. The General Counsel argues that Bales did not convey an opinion about consequences outside the Company's control. That is not so. The transcript is replete with attribution to actions Luminant might take impacting The Atlantic Group. ROA.322–23.

For case authority, the General Counsel cites *Gissel Packing Co.* and two decisions by the Board: *Hogan Transports, Inc.* and *UXB International*. Each case is factually distinguishable. In *Gissel Packing*, Chief Justice Warren writing for the Court held that an employer unlawfully threatened employees during a union

20

election campaign. A company president informed employees that the union would likely have to strike to obtain its bargaining demands and that the plant would shut down as a result, like other plants in the area had. *Gissel Packing Co.*, 395 U.S. at 619. The Court concluded section 8(c) did not apply because the employer had no basis to assert the union would inevitably strike and admitted it had no evidence other plants had shut down because of unions. *Id.*

In the Board decision of *Hogan Transports*, a company president told employees during a meeting about union organizing that its customer said "we don't have any transportation providers who will deliver to our stores in the country that are union so they said you need to keep in mind when you guys are working through the issue here." 363 NLRB 1980, 1981 (2016). From that statement, the president extrapolated that the customer would cancel its contract with the company. In another meeting, the president observed that "if the union comes in here I feel like there's probably not much to talk about because there won't be jobs." *Id.* at 1982.

In *UXB International*, during a union campaign a company supervisor wrote employees: "In my opinion, if the Union is voted in, UXB will lose the contract at Fort Ord, and all of us will be out of a job if that happens." 321 NLRB 446, 451–52 (1996). However, the letter provided no details whatsoever about the basis for that opinion. *See id.* Neither *Hogan* nor *UXB* were reviewed by a federal appeals court.

In contrast, Bales provided an objective basis for his opinion that Luminant would cancel the contract if the employees unionized. Again, Bales stated that "the client [Luminant] wants this group to remain non-union" and that "I have heard it from Luminant executives in the past." ROA.322. This is not a situation where, like in *Hogan Transports*, the company president ventured a speculative guess from an ambiguous customer statement. Nor is it the same as *UXB International* where a supervisor gave no basis whatsoever for his prediction that a customer would cancel the contract. Instead, Bales said his prediction was based on past experience with Luminant at Comanche Peak and from direct statements from Luminant executives. ROA.322–23.

The cases cited by the General Counsel are further distinguishable because the section 8(a)(1) findings rested on a series of cascading threatening actions during a union campaign. In *Gissel*, the company president made repeated threatening comments over a period of weeks. The anti-union campaign included a pamphlet "that purported to be the obituary of companies," along with cartoons depicting the preparation of a grave for the company and headstones for others that had gone out of business due to unions. *Gissel Packing Co.*, 395 U.S. at 587. On the day before the election, the president told employees that the company was in a precarious financial condition, that a strike would jeopardize continued operation of the plant, and reiterated that the employees were old, uneducated, and had dim prospects for

finding another job. *Id.* at 587–88. In *Hogan Transports*, the alleged threats during that union campaign were accompanied by unlawful promises to grant raises. 363 NLRB at 1981, 1983–84. Similarly, in *UXB International*, the employer unlawfully surveilled employees for union activity during the election campaign. 321 NLRB at 451.

The record here contains no evidence of any other egregious conduct, let alone the persistently egregious conduct of the cases above. Instead, the sole evidence is the purported transcription and recording of Bales. Bales expressly disclaimed that he was speaking on behalf of the Company. He made clear he was expressing personal opinions and he might be wrong. ROA.321. Bales expressed admiration for the audience with encouragement to do what is best for their families. ROA.319, 323–24. He then noted his concern, based on his experience and comments he heard from Luminant, that Luminant would cancel a staffing contract if employees unionize. The statements made by Bales were non-threatening opinions about possible third-party action and therefore protected by section 8(c). *See* Pet'r Br. 47–49 (collecting authority).

## III.    The Board Cannot Require Employers To Violate The NLRA In Order To Exercise Administrative Rights Of Review.

Not all policies of federal agencies are enforceable simply because the agency has authority to regulate the subject matter. Occasionally, government agencies go

too far and do an injustice to a statute and those covered by the statute. This is one of those occasions.

After a regional director certifies a bargaining unit, Congress, through the NLRA, granted employers the right to seek review of the certification by the Board, 29 U.S.C. § 153(b). After certification, voluntarily bargaining with a union waives the employer's right to pursue a request for review. *Technicolor Gov't Servs., Inc. v. NLRB*, 739 F.2d 323, 327 (8th Cir. 1984). In conflict with the right to have a union election certification reviewed by the Board, the Board holds that an employer who submits a request for review and refuses to bargain—as it must to preserve its right of review—acts "at its peril" and commits an unfair labor practice. *Audio Visual Servs. Grp., Inc.*, 365 NLRB No. 84 slip op. at 2 (2017). The result of these conflicting principles is that the Board requires an unlawful refusal to bargain as a condition to the statutory right of review. The Board itself has recognized the absurdity of its position that an employer must either violate the law or waive its rights.

In 2020, the Board issued a final rule that would have delayed certification of a union until after the time to file a request for review expired or the Board ruled on a pending request for review. Representation-Case Procedures, 84 Fed. Reg. 69,254 (Dec. 19, 2019) (the "2020 Rule").[5] The 2020 Rule sought to return Board procedure

---

[5] The rule was ultimately enjoined for administrative procedure reasons, *see*

to a prior standard under which final certification of a union was delayed until pending challenges to certification were resolved. *Id.* at 69,554-55. That common sense practice was undone by a 2014 rulemaking by the Board that "instituted a shift from a procedural model in which regional directors infrequently issued certification decisions when an appeal to the Board was pending or still possible to a model where regional directors almost always issue certifications despite the pendency or possibility of appeal." *Id.* at 69,544.

In its commentary to the 2020 Rule, the Board highlighted the issue the Company raises here. The Board observed that immediate issuance of final certification despite a pending request for review created an untenable situation because it could force an employer into "a technical 8(a)(5) refusal-to-bargain charge." *Id.* at 69,555. In issuing the 2020 Rule, the Board determined that reverting to its prior practice of delaying certification until challenges were resolved would "better serve the interests of transparency, finality, efficiency, and uniformity." *Id.* at 69,554.

A Board adjudication in 2019 reinforces the point that obligating employers to either waive review of a union certification or commit an unfair labor practice under section 8(a)(5) is arbitrary. *See NP Palace, LLC*, 368 NLRB No. 148, slip op.

---

*AFL-CIO v. NLRB*, No. 20-5223 (D.C. Cir. Jan. 17, 2023), but the Board's substantive commentary surrounding the rule is instructive.

at 1, 5 (2019). In a footnote, the General Counsel claims that *NP Palace* did not signal Board retreat from its bargain or refuse-to-bargain approach. Resp't Br. 30 n.8. That is not correct.

The duty to supply information is a fundamental part of the duty to bargain. *See NLRB v Truitt Mfg. Co.*, 351 U.S. 149, 152–53 (1956). The Board's holding in *NP Palace* that an employer may engage in "accommodative bargaining" about an information request—which is of course still bargaining—is an acknowledgment of the unworkability of requiring employers to refuse to bargain to preserve review rights. The Board's attempt to distinguish *NP Palace* is without doctrinal foundation.

The General Counsel also criticizes a lack of authority in the Company's brief. Resp't Br. 30. That observation is myopic. In its commentary to the 2020 Rule, the Board noted that its "approach in most cases for over 50 years prior to 2014" was to delay certification until challenges are resolved. *See* 84 Fed. Reg. at 69,555. If there is a lack of authority, it is because the Board changed course in this case to challenge a refusal to bargain before The Atlantic Group's Request for Review was resolved.

In fact, in a recent brief to the D.C. Circuit, the General Counsel's office argued that the delayed final certification rule would have a "de minimis impact" because "the Board's regional offices generally have not issued unfair labor practice complaints asserting that employers were not bargaining pursuant to certifications that are subject to pending requests for review." *See AFL-CIO v. NLRB*, No. 20-

26

5223, Dkt. 1869577, at 63 (D.C. Cir. Nov. 11, 2020). Based on its own briefing in another circuit court case, the Board's position in this case, that The Atlantic Group committed a refusal to bargain while its review petition was pending, is novel. Therefore, it is not surprising that little circuit court authority exists on this issue.

Additionally, the General Counsel's concern about "boxing in the union" is inapplicable here. Resp't Br. 31. Cases cited by the General Counsel addressing that concern involve situations where an employer made large-scale unilateral changes to employment terms after an election, but before union certification. *See, e.g.*, *NLRB v. Westinghouse Broad. & Cable, Inc.*, 849 F.2d 15, 20–22 (1st Cir. 1988) (employer eliminated the bargaining unit by subcontracting all of its work). There is no evidence of similar wide-scale changes in this case.

The Atlantic Group's contention is not that it should be permitted to make whatever unilateral change it desires. Rather, the Company should not be found liable for what amounts to a Board-mandated refusal to bargain to preserve its right to challenge a bargaining unit certification. No government agency should be indulged in requiring that individuals or entities subject to its jurisdiction be forced to choose between waiving statutory rights or violating statutory duties.

The Board's current policy that an employer <u>must</u> commit an unlawful refusal to bargain as a condition to exercising statutory review rights is inconsistent with

section 9(b) of the Act and fundamental fairness.    The Court should decline enforcement of the Board's finding for this reason.

## CONCLUSION

The Atlantic Group requests that this Court grant this Petition for Review, deny the Board's Cross Petition for Enforcement, decline to enforce the Board's order, and award The Atlantic Group any further relief to which it is entitled.

Respectfully submitted,


By:   */s/ John V. Jansonius*
    John V. Jansonius
    David Schlottman
    **JACKSON WALKER LLP**
    2323 Ross Avenue, Suite 600
    Dallas, Texas 75201
    (214) 953-6000

    Michael A. Drab
    **JACKSON WALKER LLP**
    1401 McKinney St., Ste. 1900
    Houston, TX 77010
    (713) 752-4446

*Counsel for Petitioner/Cross-Respondent*

## *CERTIFICATE OF SERVICE*

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on February 22, 2023.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

  */s/ John V. Jansonius*
John V. Jansonius
*Counsel for Petitioner/Cross-Respondent*

## *CERTIFICATE OF COMPLIANCE*

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

[X]    this brief contains 6,495 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) or 5th Cir. R. 32.2, *or*

[  ]    this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X]    this brief has been prepared in a proportionally spaced typeface using *Microsoft Word 2010* in *New Times Roman 14-point typeface*, or

[  ]    this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

*/s/ John V. Jansonius*
John V. Jansonius
*Counsel for Petitioner/Cross-Respondent*

Dated:  February 22, 2023

35262323